1  James M. Dowd (SBN 259578))
   James.Dowd@wilmerhale.com
2  WILMER CUTLER PICKERING
     HALE AND DORR LLP
3  350 South Grand Avenue, Suite 2100
   Los Angeles, CA 90071
4  Telephone: +1 213 443 5300
   Facsimile: +1 213 443 5400
5

6  *Attorneys for Defendant ARJOT SANDHU*

7

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11               **SAN FRANCISCO DIVISION**

12

13  FOCAL POINT FILMS, LLC, a California       Case No.  3:19-cv-02898-JCS
    limited liability company,
14                                             **DEFENDANT ARJOT SANDHU'S FIRST**
15  Plaintiff/Counter-Defendant,               **AMENDED ANSWER AND**
                                               **COUNTERCLAIMS TO COMPLAINT**
16         vs.                                 **FOR DECLARATORY JUDGMENT OF**
                                               **COPYRIGHT OWNERSHIP**
17  ARJOT SANDHU, an individual,
18
    Defendant/Counter-Plaintiff.
19                                             **DEMAND FOR JURY TRIAL**

20  ARJOT SANDHU, an individual,

21  Defendant/Counter-Plaintiff,

22         vs.

23  FOCAL POINT FILMS, LLC, a California
    limited liability company,
24
25  Plaintiff/Counter-Defendant,

26  and BRYAN GIBEL, an individual,

27  Counter-Defendant.

28

Defendant Arjot Sandhu ("Sandhu") by and through her undersigned counsel, hereby answers and responds as follows to Complaint for Declaratory Judgment of Copyright Ownership ("Complaint") filed by Plaintiff Focal Point Films, LLC ("Focal Point" or "Plaintiff") in the above-captioned action ("Action").

Defendant denies each and every allegation in the Complaint, including without limitation allegations appearing in headings, subheadings, and footnotes, except as expressly admitted herein, and specifically deny that Plaintiff is entitled to the relief sought in their Prayer for Relief.  The preamble to the Complaint states legal contentions to which no response is required, which are hereby accordingly denied.  The headings appearing in the Complaint are reproduced below for ease of reference.  To the extent any heading is deemed to state an allegation of fact, it is denied.  Defendant reserves the right to amend and/or supplement this Answer.

**ANSWER TO SPECIFIC ALLEGATIONS**

**NATURE OF THE ACTION**

**COMPLAINT ¶ 1**

Focal Point brings this action to stop Sandhu from sabotaging Focal Point's documentary film entitled *Sign My Name to Freedom* (the "Film").  Focal Point, through its principal and only member Bryan Gibel, is the sole originator, producer, owner and mastermind of the Film.  More than a year into the Film's production, Gibel met Sandhu and she began to assist him with the project by providing cinematography and production related services.  After working on the project for several months, Sandhu began making outrageous requests, including that she receive half of the Film's profits, Co-Director credit, and other significant entitlements.  Gibel never agreed to any of these requests.  Not to be deterred, Sandhu began sneaking her unapproved credits into grant applications and pitch materials.  Then, against Gibel's specific instructions, Sandhu submitted these materials to third parties using Gibel's name and signature.  Gibel told Sandhu that he did not want her working on the project any longer but she has refused to comply.  Sandhu continues holding herself out as an

1  authorized representative of the Film and now claims that she is a joint author of the Film.

2  **ANSWER TO COMPLAINT ¶ 1**

3  Defendant, Arjot Sandhu, admits that Focal Point is the alter ego of Bryan Gibel, and

4  that Ms. Sandhu is entitled to receive co-director credit and one half of any profits from the

5  film *Sign My Name to Freedom* (the "Film").  Ms. Sandhu further admits that she was

6  properly credited (at least in part) in certain grant applications and pitch materials related to

7  the Film.  Ms. Sandhu further admits that she is, in fact, a joint author of the Film.  Ms.

8  Sandhu denies all other allegations stated in Paragraph 1.

9  **COMPLAINT ¶ 2**

10  By casting a cloud over title to the Film, Sandhu has thwarted—and continues to

11  thwart—Focal Point's ability to finance, complete and exploit its Film.  Due to Sandhu's

12  misrepresentations, at least one accomplished producer has refused to invest in the project or

13  assist with fundraising unless and until Focal Point resolves Sandhu's false claim of joint

14  authorship.  Betty Reid Soskin, the 97-year old National Park Ranger who is the subject of the

15  documentary, strongly agrees that Focal Point is the Film's sole author and desperately wants

16  to continue filming and see the finished product while she is still in good health.  Soskin and

17  every other person meaningfully involved with the production of the Film is prepared to

18  testify in support of Focal Point's position.

19  **ANSWER TO COMPLAINT ¶ 2**

20  Ms. Sandhu admits that Ms. Betty Reid Soskin is the subject of the Film, is

21  approximately 97 years of age, and was at one time a National Park Ranger.  Ms. Sandhu

22  lacks knowledge or information sufficient to form a belief as to the present state of mind of

23  either Ms. Soskin or "every other person meaningfully involved with the production of the

24  Film," and as such these allegations in Paragraph 2 are therefore denied on that basis.  Ms.

25  Sandhu denies all remaining allegations in Paragraph 2.

26  **COMPLAINT ¶ 3**

27  Focal Point has offered many times to give Sandhu a credit in the Film that reflects her

28

1   contributions and to compensate Sandhu based on rates and hours she herself calculated.

2   Sandhu has rejected those offers.  Sandhu refuses to back off her claim of joint authorship or

3   her demands for credits and compensation that far exceed what she was offered or the value of

4   her services.  Accordingly, Sandhu has left Focal Point with no choice but to seek justice from

5   this Court.  Focal Point seeks (1) a declaration that Focal Point is the sole author of the Film

6   and that Sandhu holds no copyright interest in the Film; (2) an injunction prohibiting Sandhu

7   from holding herself out as an authorized representative of the Film; (3) an award of Focal

8   Point's costs and attorney's fees that Sandhu is forcing Focal Point to expend to invalidate her

9   objectively unreasonable claim of joint authorship; and (4) such other and further relief as the

10   Court deems just and proper.

11   **ANSWER TO COMPLAINT ¶ 3**

12        Ms. Sandhu admits that she is in fact a joint author of the Film and that she is entitled

13   to receive credit as such, as well as one half of any profits from the film.  No response is

14   required to the final sentence of Paragraph 3, which consists of conclusions of law.  To the

15   extent any response is required, Ms. Sandhu denies the allegations in the final sentence of

16   Paragraph 3.  Ms. Sandhu denies all remaining allegations in Paragraph 3.

17                              **JURISDICTION AND VENUE**

18   **COMPLAINT ¶ 4**

19        This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331

20   and 1338 because this case arises under the Copyright Act and federal courts have exclusive

21   jurisdiction over cases arising under the Copyright Act.

22   **ANSWER TO COMPLAINT ¶ 4**

23        Ms. Sandhu admits the allegations in Paragraph 4.

24   **COMPLAINT ¶ 5**

25        This Court has personal jurisdiction over Sandhu because, upon information and

26   belief, Sandhu resides in this district.

27

28

**ANSWER TO COMPLAINT ¶ 5**

Ms. Sandhu admits the allegations in Paragraph 5.

**COMPLAINT ¶ 6**

Venue is proper in this district pursuant to 28 U.S.C. § 1400(a) because this action arises under the Copyright Act and, upon information and belief, Sandhu resides in this district.

**ANSWER TO COMPLAINT ¶ 6**

Ms. Sandhu admits the allegations in Paragraph 6.

**INTRADISTRICT ASSIGNMENT**

**COMPLAINT ¶ 7**

This is an Intellectual Property Action to be assigned on a district-wide basis pursuant to Civil Local Rule 3-2(c).

**ANSWER TO COMPLAINT ¶ 7**

Ms. Sandhu admits the allegations in Paragraph 7.

**PARTIES**

**COMPLAINT ¶ 8**

Plaintiff Focal Point Films, LLC is a California limited liability company with its principal place of business in Oakland, California.

**ANSWER TO COMPLAINT ¶ 8**

Ms. Sandhu admits Focal Point Films has purported to be a limited liability company. Ms. Sandhu lacks knowledge or information regarding the truth of that assertion, or of the remaining allegations in Paragraph 8 sufficient to form a belief as to their truth, and therefore denies them on that basis.

**COMPLAINT ¶ 9**

Sandhu is an individual who, upon information and belief, resides in Pittsburg, California.

**ANSWER TO COMPLAINT ¶ 9**

Ms. Sandhu admits the allegations in Paragraph 9.

<strong>FACTUAL BACKGROUND</strong>

**Bryan Gibel and Focal Point**

**COMPLAINT ¶ 10**

Bryan Gibel is the sole member and principal of the film production company Focal Point, which Gibel founded in December 2015.  Gibel is a director, producer, editor and cinematographer.  Gibel earned a master's degree from the UC Berkeley Graduate School of Journalist documentary film program in 2012, where he was awarded the Mark Felt Fellowship for Investigative Reporting.  While at Berkeley, Gibel directed, shot and edited *Chicago Confessional*, a 26-minute documentary film about wrongful convictions and an inmate's fight for a new trial after 30 years in prison.

**ANSWER TO COMPLAINT ¶ 10**

Ms. Sandhu admits that Focal Point is the alter ego of Mr. Gibel.  Ms. Sandhu lacks knowledge or information of the allegations stated in the first sentence of Paragraph 10 sufficient to form a belief as to their truth, and therefore denies them on that basis.  Ms. Sandhu admits that Mr. Gibel purports to be a director, producer, editor and cinematographer. Ms. Sandhu lacks knowledge or information of the remaining allegations stated in the second sentence of Paragraph 10 sufficient to form a belief as to their truth, and therefore denies them on that basis.  Ms. Sandhu lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations stated in Paragraph 10, and therefore denies them on that basis.

**The Film**

**COMPLAINT ¶ 11**

Gibel created and did significant work on the Film for more than a year before he even met Sandhu.  In or about February 2016, Gibel was introduced to Betty Reid Soskin, then a 94-year old African woman who entered the public spotlight when she became the oldest

1  National Park Ranger serving in the United States.  Gibel learned that Soskin had an

2  exceptional and largely untold history as a talented singer/songwriter during the civil rights

3  movement in the 1960s.  Gibel set out to create a documentary film about Soskin through his

4  production company Focal Point.

5  **ANSWER TO COMPLAINT ¶ 11**

6  Ms. Sandhu admits that Ms. Soskin is an African American woman who was formerly

7  94 years of age, and was the eldest National Park Ranger serving in the United States.  Ms.

8  Sandhu further admits that Ms. Soskin has an exceptional history as a talented

9  singer/songwriter during the civil rights movement in the late 1960s.  Ms. Sandhu denies the

10  remaining allegations in Paragraph 11.

11  **COMPLAINT ¶ 12**

12  Soskin and Gibel quickly developed a close friendship and working relationship.

13  Although Soskin had been approached many times in her life by filmmakers wanting to create

14  a documentary film about her, she trusted Gibel and wanted him to tell her story.  She gave

15  Gibel her only copies of her personal recordings so that he could try to salvage them for use in

16  the Film.  Gibel spent his own money to digitize the most important tapes, and discovered

17  dozens of stunning original songs by Soskin.  In August 2016, Soskin executed, for the benefit

18  of Focal Point, a Personal Appearance Release and Materials Release, paving the way for

19  Focal Point to start working on the Film in earnest.  Focal Point opened a corporate bank

20  account.  Focal Point began applying for film grants and seeking out other sources of funding.

21  Focal Point produced video work samples of the Film and authored detailed descriptions of

22  the Film, which Gibel submitted to documentary film foundations and other potential

23  contributors.  Throughout the life of the project, Focal Point submitted its work under the

24  name "Focal Point Films" with a copyright notice identifying Focal Point as the Film's

25  copyright owner.

26  **ANSWER TO COMPLAINT ¶ 12**

27  Ms. Sandhu lacks knowledge or information sufficient to form a belief as to the truth

28

of the allegations stated in the first, second, and third sentences of Paragraph 12, and therefore denies them on that basis.  Ms. Sandhu admits that Ms. Soskin created original songs in the 1960s.  Ms. Sandhu lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations stated in the fourth sentence of Paragraph 12, and therefore denies them on that basis.  Ms. Sandhu lacks knowledge or information sufficient to form a belief as to the truth of the allegations stated in the remaining sentences of Paragraph 12, and therefore denies them on that basis.

**COMPLAINT ¶ 13**

On November 3, 2016, Focal Point entered into a Fiscal Sponsorship Grant Agreement with the International Documentary Association ("IDA").  This agreement established a restricted fund at the IDA to receive donations on behalf of the Film, which Gibel had named *Sign My Name to Freedom*.  Gibel soon secured a funding commitment to the IDA account from Rosie the Riveter Trust, a nonprofit organization that loved Soskin's story and believed in Gibel's vision for the Film.

**ANSWER TO COMPLAINT ¶ 13**

Ms. Sandhu admits that the International Documentary Association ("IDA") maintains a fund to receive donations on behalf of the Film, and that the film was titled *Sign My Name to Freedom*.  Ms. Sandhu denies the remaining allegations in Paragraph 13.

**COMPLAINT ¶ 14**

During the initial phase of the project, Gibel decided to work with a producing partner. The written agreement between Gibel and that producer, dated as of August 22, 2016, expressly provided that "Filmmaker Bryan Gibel / Focal Point Films is the sole production entity currently developing and producing this film project, and as such, maintains sole control of the program and its editorial content."  Although Gibel later decided not to work with this producer, Focal Point's role as the Film's sole owner and decision maker never changed.

**ANSWER TO COMPLAINT ¶ 14**

Ms. Sandhu lacks knowledge or information sufficient to form a belief as to the truth of the allegations stated in the first and second sentences of Paragraph 14, and therefore denies them on that basis.  Ms. Sandhu denies the remaining allegations in Paragraph 14.

**Arjot Sandhu**

**COMPLAINT ¶ 15**

On March 2, 2017—more than a year into the project—Gibel met Arjot a/k/a Arie a/k/a A.K. Sandhu at a Documentary Filmmaker Workshop Meetup in Berkeley, California. Following the meetup, Gibel sent Sandhu a video sample of his Film.  Sandhu responded: "Believe me when I say, this is EXACTLY the short I wanted to make on Betty...ugghh I'm sooo so jealous :D"  Sandhu disclosed that she had previously asked Soskin's supervisor for permission to film Soskin but had been denied.  Sandhu begged Gibel to let her help out on his project: "If you still have more to shoot, can I pleeeaseee come assist on set?"

**ANSWER TO COMPLAINT ¶ 15**

Ms. Sandhu admits that she met Mr. Gibel in Berkeley, California, and that they discussed collaborating on the Film.  The remaining allegations of Paragraph 15 are denied.

**COMPLAINT ¶ 16**

A month later, Gibel and Sandhu met for lunch and the two soon started dating.

**ANSWER TO COMPLAINT ¶ 16**

Ms. Sandhu admits that Mr. Gibel sought to initiate a romantic relationship with her after they began their collaboration on the Film.  Ms. Sandhu denies the remaining allegations of Paragraph 16.

**COMPLAINT ¶ 17**

For the next several months—from approximately April 2017 through October 2017—Sandhu's participation on the Film was minimal, with her work limited to assisting Gibel on set as an extra camera operator during a handful of shoots, always under Gibel's supervision and with the understanding that Sandhu would be compensated on partially deferred basis.

**ANSWER TO COMPLAINT ¶ 17**

Ms. Sandhu denies the allegations in Paragraph 17.

**COMPLAINT ¶ 18**

Beginning in or about November 2017, Gibel asked Sandhu to begin assisting with fundraising efforts for the Film on a limited basis.  He offered her an "Associate Producer" credit and listed her as such on a grant application to California Humanities.  On November 21, 2017, Sandhu sent Gibel a draft "Contract for Deferred Payment and Profit Sharing Agreement."  The draft identified Focal Point as the "Producer" of the Film and Sandhu as "Participant" who would be entitled to "the sum of 50% the amount of hours worked deferred by such Participant until the film raises $50K."  Gibel did not sign the draft because, among other reasons, it did not include work-for-hire language and many other industry standard provisions.

**ANSWER TO COMPLAINT ¶ 18**

Ms. Sandhu admits that she participated in fundraising, creative producing, and editing efforts for the Film.  Ms. Sandhu further admits that a grant application to California Humanities was submitted.  Ms. Sandhu denies that the characterization of this document is accurate, and denies Plaintiff's framing of the issues.  Ms. Sandhu denies the remaining allegations in Paragraph 18.

**COMPLAINT ¶ 19**

On or about January 24, 2018, Gibel presented Sandhu a draft "Crew Deal Memorandum" that memorialized the terms Gibel had previously discussed with Sandhu.  The draft identified Focal Point as "Employer" and Sandhu as "Employee."  The draft acknowledged that Sandhu's preferred credit was "Producer," but provided that "Credit shall be determined at Employer's sole discretion."  The draft included standard work-for-hire language by which Sandhu would agree "that this is a work-for-hire and [that she] has no claim to benefits which the Employer may derive from the Program."  Sandhu would not sign the contract and Gibel told her to send him a counter.  She did not do so until seven months

1    later.

2    **ANSWER TO COMPLAINT ¶ 19**

3        Ms. Sandhu denies the allegations in Paragraph 19.

4    **COMPLAINT ¶ 20**

5        Meanwhile, Focal Point continued to work on the Film.  Focal Point applied for

6    numerous grants, pitched the Film to potential investors, shot dozens of hours of footage,

7    hired crew, and entered into agreements with composers and other third parties.  Sandhu

8    continued to assist Gibel on the Film by providing cinematography and production-related

9    services.  At all times, Sandhu worked at Gibel's invitation and under his supervision.  Gibel

10   never ceded to Sandhu control over any material creative or business decision related to the

11   Film; final approval over any and all decisions always remained with Gibel.

12   **ANSWER TO COMPLAINT ¶ 20**

13       Ms. Sandhu denies the allegations in Paragraph 20.

14   **COMPLAINT ¶ 21**

15       On more than one occasion, Sandhu asked Gibel to credit her as a "Co-Director," in

16   addition to the producer and cinematography credits that Gibel had previously indicated he

17   would be willing to give her.  Each time Gibel refused because he did not believe Sandhu was

18   performing the work of a director or co-director.

19   **ANSWER TO COMPLAINT ¶ 21**

20       Ms. Sandhu admits that she was co-director of the Film.  Ms. Sandhu denies the

21   remaining allegations in Paragraph 21.

22   **Sandhu Proposes Unconscionable Terms**

23   **COMPLAINT ¶ 22**

24       On August 22, 2018, Sandhu finally sent Gibel a draft of a "Collaboration Agreement"

25   she had an attorney prepare.  The draft included terms that Sandhu and Gibel had never

26   discussed, much less agreed to, and reflected an alarming attempt at overreach by Sandhu.

27   She wanted *half* (49%) of the net profits of the Film.  She wanted "Lead Creative Producer"

28

1    and "Co-Director" credits.  If she managed to secure just $30,000 in investments toward the

2    Film's $450,000 budget, Sandhu wanted her Producer credit in **first position, before Gibel**.

3    She wanted "Co-Director of Photography" and "Co-Editor" credits in equal position with

4    Gibel.  She wanted Focal Point to transfer all of its rights in the Film to a new LLC of which

5    she presumably would be a member.  At the same time, she wanted Focal Point to remain

6    liable to Sandhu for all "obligations, promises, compensation and credit listed herein," while

7    she would bear no personal liability.  She wanted a ceiling on Gibel's compensation.  She

8    wanted to restrict Focal Point's rights to give credits to other people without Sandhu's

9    approval.  And she wanted Focal Point to foot her lawyer's bill to prepare this draft.

10   **ANSWER TO COMPLAINT ¶ 22**

11          Ms. Sandhu admits that she and Mr. Gibel discussed a "Collaboration Agreement"

12   regarding the Film.  Ms. Sandhu denies Plaintiff's characterizations of this draft document are

13   accurate, and denies Plaintiff's framing of the issues.  Ms. Sandhu denies the remaining

14   allegations in Paragraph 22.

15   **COMPLAINT ¶ 23**

16          Gibel was shocked by the proposed terms and told Sandhu they were unacceptable.

17   But that did not deter Sandhu.  If Gibel was not willing to give her half the profits in the Film

18   and the credits she wanted, Sandhu would find a way to take them.

19   **ANSWER TO COMPLAINT ¶ 23**

20          Ms. Sandhu denies the allegations in Paragraph 23.

21   **Sandhu Sneaks Co-Director Credit into a Grant Application Budget**

22   **COMPLAINT ¶ 24**

23          A few weeks later, on September 14, 2018, Focal Point submitted a grant application

24   to ITVS, a prominent documentary film foundation.  The application listed Gibel as

25   "Producer/Director" and Sandhu as "Producer," which at that time reflected the credit Gibel

26   was willing to give Sandhu.  When ITVS later asked Focal Point to prepare a line item budget

27   for the Film, Sandhu sneaked "Producer/Co-Director/Co-DP/Co-Editor" credits for herself

28

into the document without asking or informing Gibel.  Gibel did not notice the insertion and he submitted the budget to ITVS.

**ANSWER TO COMPLAINT ¶ 24**

Ms. Sandhu admits that she was properly identified to ITVS as "Producer/Co-Director/Co-DP/Co-Editor" of the Film.  Ms. Sandhu denies that Plaintiff's characterization of this grant application and line item budget are accurate, and denies Plaintiff's framing of the issues.  Ms. Sandhu denies the remaining allegations in Paragraph 24.

**COMPLAINT ¶ 25**

Sandhu would later rely on her ITVS budget maneuver as "proof" that Gibel had agreed to give her these credits.  This is false.  In fact, Gibel never agreed to give Sandhu Co-Director (or Co-Editor) credit.  Gibel did not even find out that Sandhu had included these credits in the ITVS application until months later, in advance of a failed mediation between the parties.

**ANSWER TO COMPLAINT ¶ 25**

Ms. Sandhu admits that she was entitled to her credits that were included in the ITVS grant application budget.  Ms. Sandhu denies the remaining allegations in Paragraph 25.

**<u>Sandhu Sneaks Co-Director Credit into an Unauthorized Pitch Deck</u>**

**COMPLAINT ¶ 26**

On November 25, 2018, Sandhu sent Gibel a draft of an email, pitch deck and work sample that she wanted to send to an accomplished documentary producer who had expressed a strong interest in joining the project as Executive Producer.  In the pitch deck, Sandhu again inserted "Co-Director" and "Co-Editor" credits without Gibel's approval.  Even more egregiously, she inserted a "Film By: Bryan Gibel and A.K. Sandhu" credit on the first page on the pitch deck.  After reviewing the deck, Bryan's message to Sandhu was unequivocal: "Since we still haven't reached an agreement about credits, but you have included credits in the deck beyond what you and I initially discussed, I'm not comfortable sending this out until we reach a formal agreement and the deck reflects the agreement we reach."  Sandhu ignored

Bryan's instructions.  The next day, she sent the deck to the potential Executive Producer with "Co-Director" and "Co-Editor" credits for herself.  Worse, she signed the email "Arie and Bryan" to make it look like it was sent with Gibel's blessing.

**ANSWER TO COMPLAINT ¶ 26**

Ms. Sandhu admits that she was at times identified as "Co-Director" and "Co-Editor" of the Film, including in communications to third-parties.  Ms. Sandhu denies the remaining allegations in Paragraph 26.

**Gibel Terminates Sandhu's Services But She Refuses to Comply**

**COMPLAINT ¶ 27**

For Gibel, sending the pitch deck to the potential Executive Producer, after he specifically told Sandhu not to, was the final straw.  Gibel ended his romantic relationship with Sandhu and told Sandhu he did not want to continue working with her on the Film.

**ANSWER TO COMPLAINT ¶ 27**

Ms. Sandhu denies the allegations in Paragraph 27.

**COMPLAINT ¶ 28**

On December 24, 2018, Gibel emailed her: "As I expressed in our conversation just now on the phone, I am not comfortable at this point with you speaking on behalf of my company or the film or sending any material that represents the film without my written approval.  If you do so, it will be directly against my instructions and it would be falsely representing Focal Point Films and me."

**ANSWER TO COMPLAINT ¶ 28**

Ms. Sandhu admits receiving an email on or about December 24, 2018, that this email purports to be authored by Mr. Gibel, and that this email makes a number of (inaccurate) self-serving statements.  Ms. Sandhu denies that the statements in that email are true.  Ms. Sandhu further denies Plaintiff's characterization of these events as accurate, and denies Plaintiff's framing of the issues.  Ms. Sandhu denies the remaining allegations in Paragraph 28.

1  **COMPLAINT ¶ 29**

2      Sandhu again ignored Gibel's instructions.  On February 2, 2019, Gibel learned that, at

3  the Sundance Film Festival, Sandhu had held herself out as an authorized representative of the

4  Film.  Gibel also discovered that Sandhu had submitted at least one grant application for the

5  Film, and continued to communicate with film festivals and other third parties, all without

6  Gibel's knowledge or authorization.

7  **ANSWER TO COMPLAINT ¶ 29**

8      Ms. Sandhu admits that she was an authorized representative of the Film at the

9  Sundance Film Festival.  Ms. Sandhu further admits that she participated in fundraising efforts

10  for the Film.  Ms. Sandhu denies the remaining allegations in Paragraph 29.

11  **COMPLAINT ¶ 30**

12      On February 25, 2019, Gibel and Sandhu participated in a private mediation session

13  conducted by the California Lawyers for the Arts.  The mediation did not result in a

14  settlement.

15  **ANSWER TO COMPLAINT ¶ 30**

16      Ms. Sandhu admits the allegations in Paragraph 30.

17  **COMPLAINT ¶ 31**

18      On March 4, 2019, Sandhu sent Gibel an email that locked in her new legal position.

19  "The reality is, we are joint authors of the work," she told Gibel.  "The vision I brought to the

20  film has drastically changed it to what it is now and I've had significant contributions in all

21  aspects of the filmmaking process for a year and a half."

22  **ANSWER TO COMPLAINT ¶ 31**

23      Ms. Sandhu admits that she is a joint author of the Film, and that the Film reflects her

24  vision and significant contributions to all aspects of the filmmaking process.  Ms. Sandhu

25  further admits she sent Mr. Gibel an email on or about March 4, 2019 discussing her joint

26  authorship to the Film, the contents of which speaks for itself.  Ms. Sandhu denies that any

27  such communication "locked in her new legal position."

28

**Sandhu's Claim of Joint Authorship is Objectively Unreasonable**

**COMPLAINT ¶ 32**

Sandhu's claim of joint authorship is objectively unreasonable under well-established copyright law.  In its landmark decision on joint authorship, the Ninth Circuit made clear that creative contributions, even important ones, are never enough to establish a motion picture as a joint work.  *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000).  The court forewarned of precisely the danger presented by "overreaching contributors" like Sandhu: "Claimjumping by research assistants, editors, and former spouses, lovers and friends," observed the Court, "would endanger authors who talked with people about what they were doing, if creative copyrightable contribution were all that authorship required."  *Id.*

**ANSWER TO COMPLAINT ¶ 32**

Ms. Sandhu denies the allegations in the first sentence of Paragraph 32.  No response is required to the remaining allegations in Paragraph 32, which consist of conclusions of law. To the extent any response is required, Ms. Sandhu denies the remaining allegations in Paragraph 32.

**COMPLAINT ¶ 33**

The Ninth Circuit held that, to establish joint authorship, a contributor must prove, first and foremost, that she "superintended the work by exercising control."  *Id.*  Here, only Focal Point, not Sandhu, originated the Film, and only Focal Point superintended and exercised control over every creative and business decision related to the project.  Focal Point is the Film's creator, sole decision maker, and "mastermind."

**ANSWER TO COMPLAINT ¶ 33**

No response is required to the first sentence of Paragraph 33, which consists of conclusions of law.  To the extent any response is required, Ms. Sandhu denies the allegations in the first sentence of Paragraph 33.  Ms. Sandhu denies the remaining allegations in Paragraph 33.

1

**COMPLAINT ¶ 34**

2      A contributor claiming joint authorship also must show that the "putative coauthors

3   made objective manifestations of a shared intent to be coauthors."  *Id.*  Here, Focal Point

4   never manifested any intention to share authorship of the Film with Sandhu.  To the

5   contrary—the only intention Focal Point ever manifested was to remain the Film's sole author

6   and copyright owner.

7   **ANSWER TO COMPLAINT ¶ 34**

8      No response is required to the first sentence of Paragraph 34, which consists of

9   conclusions of law.  To the extent any response is required, Ms. Sandhu denies the allegations

10   in the first sentence of Paragraph 34.  Ms. Sandhu denies the remaining allegations in

11   Paragraph 34.

12   **COMPLAINT ¶ 35**

13      Finally, a contributor claiming joint authorship must prove that the "audience appeal

14   of the work turns on both contributions" and "the share of each in its success cannot be

15   appraised."  *Id.*  Here, the audience appeal and success of the work will turn, primarily, on the

16   subject of the Film, Betty Reid Soskin.  Critically, Soskin agreed to work with Gibel, not

17   Sandhu.  It was Gibel, not Sandhu, who developed a friendship and outstanding working

18   relationship with Soskin and members of her family.  It was Gibel, not Sandhu, who

19   successfully acquired rights from Soskin.  Sandhu tried to get Soskin to work with her on

20   Sandhu's own project but Soskin declined.  Indeed, Soskin has made quite clear that she ***did***

21   ***not*** and ***does not*** want to work with Sandhu.  As between the parties, the audience appeal and

22   success of the Film will turn on the contributions of Gibel, not Sandhu.

23   **ANSWER TO COMPLAINT ¶ 35**

24      No response is required to the first sentence of Paragraph 35, which consists of

25   conclusions of law.  To the extent any response is required, Ms. Sandhu denies the allegations

26   in the first sentence of Paragraph 35.  Ms. Sandhu admits that Ms. Soskin is the subject of the

27   Film, but denies the remaining allegations in Paragraph 35.

28

**COMPLAINT ¶ 36**

In short, none of the factors support Sandhu's claim of joint authorship.  Sandhu simply refuses to accept this reality.

**ANSWER TO COMPLAINT ¶ 36**

No response is required to the first sentence of Paragraph 36, which consists of conclusions of law.  To the extent any response is required, Ms. Sandhu denies the allegations in the first sentence of Paragraph 36.  Ms. Sandhu denies the remaining allegations in Paragraph 36.

* * *

**COMPLAINT ¶ 37**

Sandhu's false claim of joint authorship threatens the life of the project by casting a cloud over title to the Film.  One potential producer now refuses to invest in or help raise money for the Film until the authorship issue is resolved.  Betty Reid Soskin, the 97-year old subject of the Film, desperately wants to complete the production and see the finished Film while she remains in good health.  In addition to the profound artistic, personal and emotional reasons driving Focal Point to make that happen, Soskin's presence at the Film's premiere and surrounding events is extremely important to the commercial success of the film.

**ANSWER TO COMPLAINT ¶ 37**

Ms. Sandhu denies the first and second sentences of Paragraph 37.  Ms. Sandhu admits that Ms. Soskin is approximately 97 years of age and is a subject of the Film, but is without knowledge or information sufficient to form a belief as to Ms. Soskin's present mental state and accordingly denies any such allegations stated in the third sentence of paragraph 37.  Any remaining allegations of the third sentence of Paragraph 37 are denied.  Ms. Sandhu admits that the Film would benefit from Ms. Soskin's participating at its premiere.  The remaining allegations of the fourth sentence of Paragraph 37 are denied.

**COMPLAINT ¶ 38**

To stop Sandhu's sabotage and allow Focal Point to bring this important Film into the

world, Focal Point needs swift intervention from this Court.

**ANSWER TO COMPLAINT ¶ 38**

Ms. Sandhu denies the allegations in Paragraph 38.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Declaratory Judgment Of Copyright Ownership

### (28 U.S.C. § 2201(a))

**COMPLAINT ¶ 39**

Focal Point repeats and re-alleges the allegations of Paragraphs 1 through 38, inclusive, as if fully set forth herein.

**ANSWER TO COMPLAINT ¶ 39**

Ms. Sandhu repeats and re-alleges her response to Paragraphs 1 through 38, inclusive, as if fully set forth herein.

**COMPLAINT ¶ 40**

An actual and justiciable controversy exists between the parties as to whether Sandhu holds a copyright interest in the Film.

**ANSWER TO COMPLAINT ¶ 40**

No response is required to Paragraph 40, which consists of conclusions of law.  To the extent any response is required, Ms. Sandhu admits the allegations in Paragraph 40.

**COMPLAINT ¶ 41**

The Film is a unitary work of authorship within the meaning of the Copyright Act, 17 U.S.C. §§ 101 *et seq.*

**ANSWER TO COMPLAINT ¶ 41**

Ms. Sandhu admits the Film is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole" within the meanings of 17 U.S.C. §§ 101 and 201(a).  Ms. Sandhu denies the remaining allegations in Paragraph 41.

**COMPLAINT ¶ 42**

Focal Point is the sole author of the Film.

**ANSWER TO COMPLAINT ¶ 42**

Ms. Sandhu denies the allegations in Paragraph 42.

**COMPLAINT ¶ 43**

Contrary to Sandhu's claim, the Film is not a "joint work" within the meaning of the Copyright Act and Sandhu is not a joint author of the Film.

**ANSWER TO COMPLAINT ¶ 43**

Ms. Sandhu denies the allegations in Paragraph 43.

**COMPLAINT ¶ 44**

In the alternative, Sandhu's individual contributions to the Film do not constitute a "work of authorship" within the meaning of the Copyright Act to which Sandhu holds any copyright interest.

**ANSWER TO COMPLAINT ¶ 44**

Ms. Sandhu denies the allegations in Paragraph 44.

**COMPLAINT ¶ 45**

Focal Point has no adequate remedy at law.

**ANSWER TO COMPLAINT ¶ 45**

No response is required to Paragraph 45, which consists of conclusions of law.  To the extent any response is required, Ms. Sandhu denies the allegations in Paragraph 45.

**COMPLAINT ¶ 46**

Focal Point is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, that Focal Point is the sole author of the Film and that Sandhu holds no copyright interest in either the Film as a whole or her individual contributions to the Film.

**ANSWER TO COMPLAINT ¶ 46**

Ms. Sandhu denies the allegations in Paragraph 46.

**PRAYER FOR RELIEF**

No response is required to Plaintiff's Prayer for Relief, which consists of conclusions of law.  To the extent any response is required, Ms. Sandhu denies the allegations in Plaintiff's Prayer for Relief, and specifically denies Plaintiff is entitled to the relief it seeks.

\*        \*        \*

**COUNTERCLAIMS**

**PARTIES**

1.      Arjot Sandhu is an individual who resides in Pittsburg, California.

2.      Upon information and belief, Bryan Gibel is an individual who resides in Oakland, California.

3.      Upon information and belief, Focal Point Films, LLC ("Focal Point") is a California limited liability company with its principal place of business in Oakland, California.  Upon information and belief, Focal Point is the alter ego of Mr. Gibel.  Unless otherwise indicated, references to "Mr. Gibel" and/or "Focal Point" below refer to each of Mr. Gibel and Focal Point collectively.  Because Ms. Sandhu's claims against Mr. Gibel and Focal Point Films, LLC arise out of the same series of transactions and occurrences, Mr. Gibel is properly joined under Federal Rule of Civil Procedure 20(a)(2).

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 because this case arises under the Copyright Act and federal courts have exclusive jurisdiction over cases arising under the Copyright Act.

5.      This Court also has supplemental jurisdiction over Ms. Sandhu's counterclaims because they form part of the same case or controversy as Focal Point's claims, and to the extent Focal Point's claims are brought under 28 U.S.C. §§ 1331 and 1338.

6.      This Court has personal jurisdiction over Focal Point and Mr. Gibel because they have already submitted to the jurisdiction of this Court by initiating this action, Focal

1   Point has its principal place of business here, and Mr. Gibel resides here.

2       7.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(d) because

3   Focal Point and Mr. Gibel chose to initiate an action in this forum.

4                              **GENERAL ALLEGATIONS**

5       8.      Arjot Sandhu is a director, producer, and internationally published

6   photographer and director of photography.  Ms. Sandhu earned a master's degree from

7   Columbia University and a bachelor's degree from University of California – Berkeley.

8       9.      Upon information and belief, Bryan Gibel is the principal and alter ego of

9   Focal Point Films, LLC, a California limited liability company.

10      10.     Beginning in April 2017, Ms. Sandhu and Mr. Gibel collaborated as

11  filmmaking partners on a feature length documentary entitled *Sign My Name to Freedom* (the

12  "Film") about the lost music and legacy of Betty Reid Soskin.

13      11.     Ms. Sandhu and Mr. Gibel collaborated on all aspects of the direction,

14  production, cinematography, editing, and worksamples of the Film, which is reflected in their

15  emails, notes, text messages, and conduct during the months they worked together.

16      12.     In addition, Ms. Sandhu personally engaged in various forms of creative

17  authorship, including (among other things): conception, creative direction, content selection,

18  directing scenes, overseeing the Film's production, supervising the work of editors, filming

19  scenes, editing footage, pitching the Film at film festivals, and collaborating on all other

20  aspects of the Film's creation and promotion, including the overall arc and direction of the

21  Film.

22      13.     During this time, Mr. Gibel publicly represented that Ms. Sandhu was a co-

23  equal partner in the creation of the Film in correspondence with third parties and promotional

24  materials for the Film.  Ms. Sandhu was, and believed that she was, a co-equal partner in the

25  creation of the Film, and accordingly invested substantial time and resources into the Film, at

26  her own personal expense and without any monetary compensation for the substantial value of

27  her creative authorship and contributions.

28

14.     Beginning in the fall of 2018, to Ms. Sandhu's surprise and without her consent, Mr. Gibel began to dispute Ms. Sandhu's credits on the Film and acted to exclude Ms. Sandhu from further involvement with the Film, including removing her from communications with potential investors and other third parties, and blocking her access to key documents, records, creative content, and production schedules for the Film, including footage shot exclusively by Ms. Sandhu herself and/or at her direction.

15.     Mr. Gibel's actions have caused the production and promotion of the Film to stall to Ms. Sandhu's and the Film's detriment, and his ongoing actions prevent Ms. Sandhu from fairly exercising her rights as co-creator of the Film.

*       *       *

**The Parties Develop and Collaborate on the Film**

16.     Ms. Sandhu and Mr. Gibel first met at a meetup for documentary filmmakers in March 2017.  They exchanged work samples after realizing that Mr. Gibel was developing a documentary short about Ms. Betty Reid Soskin and a record shop owned by Ms. Soskin's children, while Ms. Sandhu was developing a documentary about Ms. Soskin herself.

17.     Ms. Sandhu shared with Mr. Gibel that she had conducted a filmed video interview with Ms. Soskin on July 28, 2016, which reflected Ms. Sandhu's concepts for a film about Ms. Soskin.  Footage from Ms. Sandhu's interview with Ms. Soskin was later incorporated into work samples for the Film, including work samples shown to potential funders and investors.

18.     In March 2017, Mr. Gibel expressed that he intended to make a straightforward historical biopic on Ms. Soskin and the story of Reid's Records, a record store started by Ms. Soskin and her husband in 1945.

19.     As Ms. Sandhu and Mr. Gibel discussed their respective ideas for their respective films, they quickly began to discuss collaboration on a potential documentary that would present Ms. Soskin's life as a verité music documentary rather than a straightforward historical biopic – i.e., rather than the approach for which Mr. Gibel had had no success in

1   securing funding.

2        20.    In May 2017, two producers Mr. Gibel had recruited for his original historical

3   biopic project withdrew from the project due to lack of interest and ceased working with Mr.

4   Gibel.  Relatedly, to that point, Mr. Gibel had been unable to secure serious funding or

5   sponsorship interest for his concept.  Ms. Sandhu and Mr. Gibel began to further develop their

6   new verité music documentary idea.

7        21.    In June 2017, Ms. Sandhu set up a story consultation with an advisor Ms.

8   Sandhu knew personally.  In advance of this meeting, Ms. Sandhu developed the idea to

9   center the Film around a contemporary collaboration with Ms. Soskin and a youth orchestra.

10  Ms. Sandhu presented this idea to the advisor at the June 2017 meeting, the advisor reacted

11  positively to the idea, and as a result of this consultation Ms. Sandhu and Mr. Gibel jointly

12  decided to proceed with this idea as a central theme for the Film.

13       22.    From June 2017 on, Ms. Sandhu and Mr. Gibel collaborated on all aspects of

14  filmmaking, and Ms. Sandhu increasingly oversaw key aspects of the creative direction,

15  planning, setup, financing, and publicity for the Film.  For example, and without limitation,

16  Ms. Sandhu:

17       a.   Helped to develop the three-act structure for the Film, including key

18            contributions to the sequencing and content of each of the three acts;

19       b.   Developed and pitched creative collaborations with music groups to appear in

20            the Film, and worked to secure permissions for scenes including those groups;

21       c.   Prepared interview questions for the youth orchestra students involved in the

22            Film and personally directed, conducted, and filmed interviews;

23       d.   Worked with Mr. Gibel to hire additional personnel, including recruiting and

24            confirming additional cinematographers for the filming of two key concert

25            event scenes in the Film;

26       e.   Personally directed scenes for the Film, including without limitation interview

27            scenes with Ms. Soskin and a car ride with Ms. Soskin on her way to meet the

28

---

                                      23    FIRST AMENDED ANSWER TO PLAINTIFF
                                            FOCAL POINT FILMS, LLC'S COMPLAINT
                                            3:19-cv-02898-JCS

youth orchestra composer;

    f.  Co-directed scenes for the Film with Mr. Gibel;

    g.  Collaborated with Mr. Gibel on the direction of all other scenes for the Film, including without limitation advising Mr. Gibel on how to best shoot scenes for which they had assigned him responsibility;

    h.  Made countless decisions on lighting, camera angles, aperture, and other aspects of the Film's presentation and shot composition; and

    i.  Personally edited and provided guidance to editors on the Film as a whole to ensure consistency with Ms. Sandhu's and Mr. Gibel's joint creative vision for the Film.

23.    Ms. Sandhu is properly credited as a co-creator and co-author of the Film due to her significant creative contributions with respect to both the narrative development and technical aspects of the Film.

*      *      *

**The Parties Raise Awareness and Funding For The Film**

24.    For nearly two years, Ms. Sandhu and Mr. Gibel worked on the Film without compensation and publicly held themselves out together as the "Filmmakers" of the Film on social media, in the Film's web site, in grant award announcements, and in correspondence with third parties.

25.    For example, on May 5, 2018, Ms. Sandhu and Mr. Gibel participated in a public pitch competition, the DocPitch at DocLands Film Festival sponsored by the California Film Institute, where they presented the Film as "A Feature Documentary Film Currently In Production By: Bryan Gibel and A.K. Sandhu."

26.    A representative for DocLands later wrote in support of the Film: "After their impressive pitch at DocLand's DocPitch Competition in May 2018, the programming teams at the California Film Institute were convinced that filmmakers Bryan Gibel and A.K. Sandhu's project has strong appeal for festival audiences, schools, and the broader public."

27.     Prior to meeting and developing the Film with Ms. Sandhu, Mr. Gibel had submitted grant applications that pitched his historical biopic documentary idea, but failed to receive any significant funding for the project.

28.     In late 2017, Ms. Sandhu and Mr. Gibel applied for funding grants.  Ms. Sandhu drafted a treatment and synopsis of the Film that pitched it as a verité music documentary following contemporary musical collaboration between Betty Reid Soskin and three generations of musicians.

29.     Based on this pitch, the Film received grants including (but without limitation) a $20,000 grant from California Humanities (which had rejected a 2016 application from Mr. Gibel for his solo historical biopic documentary), $8,000 from the Bay Area Video Coalition, and $25,000 from the Berkeley Film Foundation.

30.     In a newsletter announcing their grant, the Berkeley Film Foundation stated: "The annual $25,000 Sal Zaentz Award went to Bryan Gibel and A.K. Sandhu, for their film Sign My Name to Freedom about Bett Reid Soskin…".

31.     Ms. Sandhu also conducted extensive outreach to industry professionals who came to support the Film, providing valuable mentorship and networking opportunities for both Ms. Sandhu and Mr. Gibel.

32.     Ms. Sandhu and Mr. Gibel represented themselves as filmmaking partners to these industry professionals, both in correspondence and in promotional material they provided to them, which described the Film as "By Bryan Gibel and A.K. Sandhu."

*         *         *

**Mr. Gibel Seeks to Exclude Ms. Sandhu**

33.     Beginning in the fall of 2018, after the concept for the Film had been agreed upon between Ms. Sandhu and Mr. Gibel, after a majority of the footage for the Film had been shot, and as the Film moved from production to editing and post-production, Mr. Gibel for the first time started to raise concerns about how credits on the Film were to be apportioned.  The parties had not previously discussed their precise credits in depth and had never executed a

1    written contract delineating their roles.  Rather, to that time, they had proceeded as equal

2    partners.

3        34.    In the fall of 2018, however, Mr. Gibel suggested that Ms. Sandhu should sign

4    a contract inconsistent with her actual contributions to their partnership that principally

5    identified her as a cinematographer on the Film.  Ms. Sandhu objected on the basis that Mr.

6    Gibel's offer did not accurately reflect her contributions to the Film.

7        35.    Ms. Sandhu was surprised by Mr. Gibel's actions.  In the preceding months,

8    Ms. Sandhu and Mr. Gibel together had retained third-parties to provide cinematography and

9    editing assistance on the Film, and had together required those third parties to execute work-

10   for-hire agreements in order to protect Ms. Sandhu's and Mr. Gibel's intellectual property

11   rights in the work-for-hire that those third parties performed.  Mr. Gibel had never once

12   suggested Ms. Sandhu sign a similar agreement (or any agreement) at the time.

13       36.    Ms. Sandhu attempted to engage Mr. Gibel in mediation to attempt to resolve

14   the dispute that his actions had precipitated and to arrive at a mutually agreeable contract, but

15   Mr. Gibel refused to participate unless Ms. Sandhu first agreed to his proposed terms (to the

16   detriment of Ms. Sandhu's rights in the Film).

17       37.    When Ms. Sandhu refused to agree to Mr. Gibel's terms, Mr. Gibel acted to

18   unilaterally exclude Ms. Sandhu from work on their Film and from the fruits of their

19   collaboration.  For example, on one occasion, Mr. Gibel scheduled a shoot without informing

20   Ms. Sandhu, and, on information and belief, did so purposefully to ensure that Ms. Sandhu did

21   not learn of the shoot until it was impossible for Ms. Sandhu to attend.

22       38.    Mr. Gibel also, without Ms. Sandhu's consent, blocked Ms. Sandhu's access to

23   the Film's promotional material and social media, and removed Ms. Sandhu's name from

24   those materials.  For instance, Mr. Gibel, without Ms. Sandhu's consent, removed Ms.

25   Sandhu's biography from the film website and changed the password to access the website,

26   despite the fact that Ms. Sandhu had personally created and designed that website.

27       39.    Mr. Gibel further, without Ms. Sandhu's consent, removed Ms. Sandhu's

28

1    access to the Google Drive location where they stored key documents for the Film, including

2    without limitation creative content, grant applications and various contracts.  The Google

3    Drive contained for example all important information and documents related to the Film,

4    many of which were created by Ms. Sandhu and Mr. Gibel.  Mr. Gibel also retained footage

5    shot by Ms. Sandhu that she can no longer access.

6        40.    Mr. Gibel has also blocked Ms. Sandhu's access to grant funds jointly raised

7    and awarded to the project, including without limitation funds from California Humanities

8    organization, the Bay Area Video Coalition, the Berkeley Film Foundation, and the Rosie the

9    Riveter Trust.  On information and belief, Mr. Gibel has deposited such funds into a bank

10   account he alone controls, and since fall 2018 has ceased providing Ms. Sandhu with any of

11   access to, control over, or an accounting for those grant funds.  On information and belief, Mr.

12   Gibel has nonetheless continued to dissipate grant funds since that time.

13       41.    Mr. Gibel made those deposits and has denied Ms. Sandhu access or control

14   even though she, as a co-applicant on the grant applications, had equal authority over the use

15   and distribution of any such funds.

16                                    *        *        *

17       42.    Mr. Gibel now refuses to collaborate further with Ms. Sandhu on the Film and

18   has actively hindered their ability to continue to raise funding necessary to complete the Film.

19       43.    For example, on March 18, 2019, the Hot Docs Dealmaker Forum ("Hot

20   Docs") selected the Film—out of over 325 applicants—to be pitched at the event.  By virtue

21   of being selected, the Film was to be presented to and Ms. Sandhu and Mr. Gibel were to be

22   afforded the opportunity to meet with a number of key international decision makers during a

23   three-day period at the largest documentary film festival in North America.  This invitation

24   thus afforded the Film a coveted spot on a key meeting program curated to producers seeking

25   financing for their documentary films from the domestic and international marketplace.  The

26   Hot Docs event is attended by a large number of representatives from both media

27   organizations interested in promoting new works and film financiers seeking to finance such

28

works.

44.     The Film was submitted via the Brown Girl's Doc Mafia, an organization that promotes films by women and non-binary people of color in the documentary film industry. Brown Girl's Doc Mafia also provided a sponsored "All Access Pass" worth $1,000 to Ms. Sandhu for the Hot Docs event.  But for Ms. Sandhu's creative contributions to and joint participation in the conception, production, and authorship of the Film, the Film would not have been eligible for sponsorship by the Brown Girl's Doc Mafia.

45.     Upon being selected to pitch at Hot Docs, Ms. Sandhu notified Mr. Gibel of the selection and requested a time to speak about the opportunity.  Because Hot Docs is among the most widely known and highly respected pitch events in documentary film making, on information and belief Mr. Gibel thus understood the opportunity that this invitation represented.

46.     Mr. Gibel responded by threatening litigation if Ms. Sandhu did not withdraw the Film from consideration.

47.     Without the funding expected from participation at Hot Docs, and as a direct result of Mr. Gibel's interference with Ms. Sandhu's ability to promote and secure continued funding for the Film, production on the Film has stalled.  Instead of agreeing to Ms. Sandhu's request that they further mediate this dispute with the goal of resuming their professional collaboration on the Film, Mr. Gibel initiated this litigation.

*       *       *

## FIRST COUNTERCLAIM

## Declaratory Judgment of Copyright Ownership

## (Declaratory Judgment Act, 28 U.S.C. § 2201)

48.     Ms. Sandhu restates and incorporates by reference her allegations in paragraphs 1 – 47 of the Counterclaims and further alleges as follows:

49.     An actual controversy exists between Ms. Sandhu and Focal Point concerning the parties' respective copyright interests in the Film.

50.     This Court can resolve the controversy by issuing a declaration of the parties' rights, status, and legal relations with respect to copyright ownership in the Film.

51.     The Film is a joint work where Ms. Sandhu and Mr. Gibel's individual contributions are inseparable.

52.     There is no executed written agreement that governs the parties' respective roles or rights with respect to the Film.

53.     Ms. Sandhu is properly credited as a co-author of the Film because she, among other things, exercised significant creative control over the Film by ideating its initial narrative arc with Mr. Gibel and overseeing its production and development.

54.     Ms. Sandhu also contributed individually copyrightable material to the Film including footage that she directed and shot in her sole capacity, interviews she prepared and filmed, and drafts of outlines and treatments used in the production and promotion of the Film.

55.     During a majority of the Film's production, Ms. Sandhu and Mr. Gibel collaborated as filmmaking partners and referred to themselves as such to each other and to the broader public.  They also referred to the Film as "A Feature Documentary Film Currently In Production By: Bryan Gibel and A.K. Sandhu."

56.     Mr. Gibel now seeks to diminish Ms. Sandhu's contributions to the Film and claims he is the sole author of the Film.

57.     Ms. Sandhu seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Film is a joint work owned between Ms. Sandhu and Bryan Gibel as co-authors and accordingly, Ms. Sandhu owns an undivided interest in the copyright of the Film.

## SECOND COUNTERCLAIM

### Unjust Enrichment

58.     Ms. Sandhu restates and incorporates by reference her allegations in paragraphs 1 – 57 of the Counterclaims and further alleges as follows:

59.     Ms. Sandhu invested substantial time and resources, including personal funds,

1  towards the creation and production of the Film.

2  60.  Nearly everyone else who worked on the Film signed work-for-hire

3  agreements, received prompt payment as work-for-hire contractors, and were consistently

4  treated as crew members rather than as co-creators of the Film.

5  61.  Ms. Sandhu and Mr. Gibel referred to their joint work as "sweat equity" in the

6  Film, with the expectation they would each be paid equally from any profits from the Film.

7  62.  Consistent with her expectation that she was a co-creator of the Film, Ms.

8  Sandhu did not receive compensation for her services as an author, producer,

9  cinematographer, director, editor, photographer, or promoter of the Film as would be typical

10  for a work-for-hire employee.

11  63.  By denying Ms. Sandhu's role and contributions to the Film, Mr. Gibel would

12  retain the benefit of Ms. Sandhu's work—including sole access to footage Ms. Sandhu shot

13  and the website she created—without having compensated her for the reasonable value of her

14  contributions.

15  ### THIRD COUNTERCLAIM

16  ### Intentional Interference with Prospective Economic Advantage

17  64.  Ms. Sandhu restates and incorporates by reference her allegations in

18  paragraphs 1 – 63 of the Counterclaims and further alleges as follows:

19  65.  Since this dispute first arose, Mr. Gibel has acted to prevent or disrupt Ms.

20  Sandhu's attempts to raise funds for the Film and support their joint project.

21  66.  For example, Ms. Sandhu was invited to pitch the Film at the Hot Docs

22  Dealmaker Forum, which represented a unique opportunity to raise awareness and attract

23  investment for the Film with film financiers from around the world, including but not limited

24  to the United States, Canada, Australia, Japan, Korea, Israel, Qatar, and Europe.

25  67.  Mr. Gibel was aware of the Hot Docs opportunity, including because Ms.

26  Sandhu informed him about the opportunity and what it meant for the success of the Film

27  (both in terms of critical acclaim and financial investment).

28

68.     Rather than advance the interests of the Film and their partnership, however, Mr. Gibel threatened legal action unless Ms. Sandhu withdrew from the Hot Docs event.

69.     As a result of Mr. Gibel's threats, Ms. Sandhu was forced to forgo the opportunity to pitch the Film at Hot Docs, and to forego the potential investment and critical recognition that accompanies having been selected for this prestigious event.

70.     As further example, Ms. Sandhu was also in the process of securing funds from a prominent documentary producer who expressed a strong interest in investing in the Film.

71.     Mr. Gibel knew of Ms. Sandhu's efforts because, among other things, Ms. Sandhu sent him a draft email, pitch deck, and work sample, which Mr. Gibel reviewed before it was sent to the individual.  After having reviewed these materials, Mr. Gibel jointly agreed with Ms. Sandhu that she should proceed with pursuing this investment in the Film.

72.     Mr. Gibel later attempted to correspond with the individual without Ms. Sandhu's knowledge, despite Ms. Sandhu having the personal relationship with the individual. Mr. Gibel's actions in attempting to go around Mr. Sandhu were both inconsistent with their joint agreement on how to pursue this potential investment opportunity, and raised concerns to the potential investor about Mr. Gibel's ability to successfully complete the Film with Ms. Sandhu.  As a result, the potential investor then declined to fund the Film citing Mr. Gibel's actions, including his allegations regarding authorship of the Film.  Mr. Gibel's interference was wrongful as it denied Ms. Sandhu's copyright interest in the Film and unjustly enriched Mr. Gibel at Ms. Sandhu's expense.

73.     Accordingly, as a direct and proximate result of Mr. Gibel's interference, Ms. Sandhu has been damaged in an amount to be determined at trial.

### FOURTH  COUNTERCLAIM

### False Advertising and Unfair Competition

### (Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(B))

74.     Ms. Sandhu restates and incorporates by reference her allegations in paragraphs 1 – 73 of the Counterclaims and further alleges as follows:

75.     After substantial completion of production on the the Film, and as the Film moved into post-production editing, Mr. Gibel and Focal Point without Ms. Sandu's consent removed Ms. Sandhu's name from the Film's promotional material, website, and social media.  Mr. Gibel and Focal Point also blocked Ms. Sandhu's access to those promotional materials and social media outlets, despite Ms. Sandhu's contributions to these materials' creation—including, for example, by personally creating and designing the Film's website – as well as the Film they advertise.

76.     Upon information and belief, since at least December 1, 2018, Mr. Gibel and Focal point have falsely represented and continue to falsely represent to public, potential funders, investors, potential purchasers, and/or others that the Film is Mr. Gibel's sole work, without crediting Ms. Sandhu as his co-author.

77.     Upon information and belief, since at least Dececmber 1, 2018, Mr. Gibel and Focal Point have falsely represented and continue falsely to represent to the public, potential funders, investors, potential purchasers, and/or others that Ms. Sandhu was never substantively involved in the conception and creation of the Film, that she improperly tried to insert herself into this project, and that she has claimed credit that is not due her.

78.     Upon information and belief, Mr. Gibel's and Focal Point's statements since about December 1, 2018 regarding the nature of Ms. Sandhu's involvement directly contradict their prior statements to the public, relevant potential funders, investors, potential purchasers, and/or others, including for example, and without limitation, Mr. Gibel's statements that Ms. Sandhu was his "filmmaking partner" and the Film was a "feature doc that AK and I are making about Betty Reid Soskin."

79.     Through their actions described above, Mr. Gibel and Focal Point have irreparably harmed Ms. Sandhu's reputation and good will within the documentary filmmaking community, including among the public, potential funders, investors, potential purchasers of the Film, and/or others in this community.

80.     For example, Ms. Sandhu spent months cultivating a personal relationship with

1   a potential investor to the Film, with whom, on information and belief, Mr. Gibel had little to

2   no contact other than through Ms. Sandhu.  The potential investor was made aware of Mr.

3   Gibel's claims of sole authorship after, on information and belief, Mr. Gibel and Focal Point

4   attempted to correspond with the potential investor without Ms. Sandhu's knowledge or

5   consent, and this potential investor subsequently declined to fund the Film citing confusion

6   caused by Mr. Gibel's claims of sole authorship.

7           81.     As further example, after Ms. Sandhu represented the Film at the 2019

8   Sundance Film Festival, Mr. Gibel and Focal Point, on information and belief, claimed that

9   Ms. Sandhu had been removed from the project and could not meet with a top industry funder

10  who had expressed interest in the Film after speaking with Ms. Sandhu at the festival.

11          82.     Upon information and belief, Mr. Gibel and Focal Point intend to continue to

12  promote the Film in film festivals and to potential investors and/or purchasers as Mr. Gibel's

13  sole work, and to advertise to anyone who will listen that (in some form of words) Ms.

14  Sandhu had no part in its conception or creation, is instead a wrongful interloper, and/or to

15  otherwise tarnish Ms. Sandhu's good name and reputation in the commumnity.

16          83.     Mr. Gibel's and Focal Point's claim that the Film is Mr. Gibel's sole work is a

17  material misreprentation.  A reasonable person within the documentary filmmaking

18  community would attach importance to the identify of the authors of a film and would be

19  induced to act on the information in making decisions.  For example, one potential investor

20  for the Film initially expressed interest in the Film because the potential investor and their

21  production company were specifically interested in funding female-made independent films.

22          84.     Mr. Gibel's and Focal Point's omission of Ms. Sandhu, and their false

23  attribution of Mr. Gibel as the Film's sole author, misrepresent the "nature, characteristics [or]

24  qualities" of the Film and Mr. Gibel and Ms. Sandhu's respective authorship and creative

25  contributions thereto.  15 U.S.C. § 1125(a)(1)(B).  On information and belief, Mr. Gibel's and

26  Focal Point's actions are likely to cause confusion, deception, or mistake among a substantial

27  number of consumers by creating the false and misleading impression that Mr. Gibel is the

28

1   source of Ms. Sandhu's creative work, and the sole author of the Film which Ms. Sandhu co-

2   authored.

3       85.    On information and belief, Mr. Gibel and Focal Point have made false

4   statements about the Film in interstate commerce, including but not limited to through the

5   Internet via the website for the Film.

6       86.    Mr. Gibel's conduct constitutes false advertisement and unfair competition in

7   violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Because of Mr.

8   Gibel's conduct, Ms. Sandhu has suffered and will continue to suffer reputational injury as

9   outlined above and is entitled to relief set forth in 15 U.S.C. § 1117(a) including profits;

10  damages and costs; attorney fees; and injunctive relief.

11                          **FIFTH COUNTERCLAIM**

12                  **False Advertising and Unfair Competition**

13                      **(Cal. Bus. & Prof. Code § 17200)**

14      87.    Ms. Sandhu restates and incorporates by reference her allegations in

15  paragraphs 1 – 86 of the Counterclaims and further alleges as follows:

16      88.    California's Unfair Competition Law ("UCL") defines unfair business

17  competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

18      89.    Mr. Gibel's and Focal Point's conduct, including their unlawful deployment of

19  false and/or misleading statements as described above, violates the "unfair" prong of the UCL.

20      90.    Mr. Gibel and Focal Point's conduct violates public policy, including but not

21  limited to such policy as set forth in the Lanham Act and in California common law, as pled

22  above.

23      91.    Mr. Gibel and Focal Point are wrongfully, unfairly, and intentionally

24  preventing Ms. Sandhu from exercising her own rights in the Film by, for example, removing

25  and blocking Ms. Sandhu's access to key documents, materials, and footage for the Film

26  (much of which they created together, and some of which was Ms. Sandhu's sole work) and

27  preventing her from promoting the Film and her work to the public.

28

92.     Mr. Gibel and Focal Point are further wrongfully, unfairly, and intentionally seeking to derive for themselves the fullest possible benefit from Ms. Sandhu's months of creative work and efforts on behalf of their filmmaking partnership, which Mr. Gibel previously actively sought and encouraged, by now, on information and belief, diminishing her contribution, publically portraying her as an unwanted interloper to his project, and causing substantial reputational harm to Ms. Sandhu within her industry.

93.     As a result, consumers have been and/or are likely to be confused, mistaken, or deceived as to the affiliation, connection, and/or association of Ms. Sandhu and the Film; and/or as to the nature, characteristics, or qualities of the Film and Mr. Gibel and Ms. Sandhu's respective contributions and ownership thereof.

94.     Mr. Gibel and Focal Point's conduct is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.  Among other things, by representing the Film as Mr. Gibel's sole work, Mr. Gibel and Focal Point, on information and belief, have misled, and continue to mislead, potential investors in the Film and members of the documentary filmmaking community, who would attach importance to the identify of the authors of a film and would be induced to act on the information in making decisions.

95.     Mr. Gibel and Focal Point's conduct is oppressive and has resulted in substantial injury to Ms. Sandhu and consumers, and there are no countervailing benefits to consumers or competition outweighing this injury.

96.     The injury posed by this conduct is not injury that consumers themselves could have reasonably avoided.  Potential investors in the Film and members of the documentary filmmaking community would reasonably rely on Mr. Gibel's portrayal of himself as the Film's sole author.  On information and belief, potential investors in and/or purchasors of the Film and members of the documentary filmmaking community do not have sufficient information to adequately evaluate Mr. Gibel's claim of sole authorship.

97.     Mr. Gibel's and Focal Point's conduct is also "unlawful" under the UCL as it violates, for example, and without limitation, Lanham Act Section 43(a), 15 U.S.C. §

1   1125(a)(1)(B) and constitutes the common law tort of intentional interference with

2   prospective economic advantage, which not only result in liability as to those individual

3   causes of action, but also provide a basis for finding liability under the UCL.

4        98.     Mr. Gibel's and Focal Point's conduct is unlawful and unfair, and constitutes

5   unfair competition in violation of Cal. Bus. & Prof. Code § 17200.  As a direct and proximate

6   result of Mr. Gibel's and Focal Point's conduct, Mr. Gibel and Focal Point has been unjustly

7   enriched and should be ordered to disgorge any and all profits earned as a result of such unfair

8   and unlawful conduct.

9   **PRAYER FOR RELIEF**

10        Wherefore, Ms. Sandhu respectfully requests that the Court:

11        1.     Enter an order denying Focal Point's Prayer for Relief;

12        2.     Enter a declaratory judgment that Focal Point is not the sole author of the Film,

13   that the Film is a "joint work" within the meaning of the Copyright Act, and that Ms. Sandhu

14   is a co-owner of the copyright of this joint work;

15        3.     Award Ms. Sandhu damages, including but not limited to compensatory and

16   punitive damages, together with pre-judgment and post-judgment interest, in an amount to be

17   determined at trial;

18        4.     Award Ms. Sandhu relief as set forth in 15 U.S.C. § 1117(a) including profits;

19   damages and costs; and attorney fees;

20        5.     Permanently enjoin Mr. Gibel's and Focal Point's continued unlawful conduct,

21   including, without limitation, Mr. Gibel and Focal Point's dissemination of false and

22   misleading information regarding Ms. Sandhu to the public as alleged above;

23        6.     Enter an order requiring Mr. Gibel and Focal Point to disgorge all profits and

24   compensation improperly obtained by Mr. Gibel and Focal Point as a result of such acts and

25   practices declared by this Court to be an unlawful;

26        7.     Award Ms. Sandhu her reasonable costs and expenses, including reasonable

27   attorney's fees, incurred in connection with this Action, including without limitation pursuant

28

1    to 17 U.S.C. § 505; and

2            8.      Grant Ms. Sandhu any such other and further relief that this Court deems just

3    and proper.

4                                  **JURY TRIAL DEMAND**

5            Ms. Sandhu demands a jury trial on all counterclaims and all issues so triable.

6    ///

7    ///

8

9    Dated: August 1, 2019                                Respectfully submitted,

10

                                                By:   */s/ James M. Dowd*
11                                                     James M. Dowd (SBN 259578))
                                                       James.Dowd@wilmerhale.com
12                                                     WILMER CUTLER PICKERING
                                                         HALE AND DORR LLP
13                                                     350 South Grand Avenue, Suite 2100
                                                       Los Angeles, CA 90071
14                                                     Telephone: +1 213 443 5300
                                                       Facsimile: +1 213 443 5400
15

16                                                     *Attorneys for Defendant ARJOT SANDHU*

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on August 1, 2019, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.5.

*/s/ James M. Dowd*
James M. Dowd