UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOCAL POINT FILMS, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ARJOT SANDHU,<br><br>　　　　Defendant. | Case No. 19-cv-02898-JCS<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 31 |

## I.　INTRODUCTION

Plaintiff Focal Point Films, LLC ("Focal Point") and its sole member Bryan Gibel (referred to collectively herein as "Gibel") bring a copyright action seeking a declaratory judgment that Gibel is the sole author of a documentary film called *Sign My Name to Freedom* (the "Film") that Defendant Arjot Sandhu also worked on. Sandhu, in turn, has asserted a counterclaim seeking a declaratory judgment that she is a co-author of the Film and owns an undivided interest in the copyright of the Film, as well as other related counterclaims. Presently before the Court is Gibel's Motion to Dismiss Defendant/Counter-Plaintiff's Counterclaims in Part ("Motion"). A hearing on the Motion was held on December 6, 2019. For the reasons stated below, the Motion is GRANTED.[1]

## II.　BACKGROUND

### A.　Complaint

Gibel alleges in the Complaint that he is a "director, producer, editor and cinematographer" with a masters degree from the UC Berkeley Graduate School of Journalism documentary film

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

program. Complaint ¶ 10. He founded Focal Point in 2015. *Id*. According to Gibel, in 2016 he met Betty Reid Soskin, "a 94-year old African American woman who entered the public spotlight when she became the oldest National Park Ranger serving in the United States." *Id*. ¶ 11. Gibel alleges he set out to create a documentary film about Soskin with Soskin's cooperation. *Id*. ¶ 12. Gibel alleges that "in March 2017, "[m]ore than a year into the project," he met Sandhu at a documentary filmmaker workshop. *Id. ¶* 15. When Gibel told Sandhu about the Film, she asked if she could assist on set; Gibel agreed and between April 2017 and October 2017 Sandhu worked "as an extra camera operator during a handful of shoots, always under Gibel's supervision and with the understanding that Sandhu would be compensated on partially deferred basis." *Id*. ¶ 17. According to Gibel, beginning in November 2017 Sandhu began to help with fundraising for the Film. *Id*. Gibel alleges that he offered Sandhu an "Associate Producer" credit for this work. *Id*. However, Gibel and Sandhu were unable to reach agreement on a written contract setting forth their arrangement, with Gibel rejecting draft agreements proposed by Sandhu in November 2017 and August 2018 and Sandhu rejecting a draft agreement proposed by Gibel in January 2018. *Id.* ¶¶ 18-23.

Gibel alleges that in November 2018 Sandhu snuck unauthorized co-director and co-editor credits for herself into a "pitch deck" for the film and that even after he told Sandhu he was terminating her services she continued to hold herself out as an authorized representative of the Film. *Id*. ¶¶ 26-31. The Film has not been completed and Gibel alleges that Sandhu's conduct is "casting a cloud" over the Film and preventing him from obtaining the financing needed to complete it. *Id.* ¶ 2. In his Complaint, Gibel seeks a declaratory judgment that "Focal Point is the sole author of the Film," and that "the Film is not a 'joint work' within the meaning of the Copyright Act and Sandhu is not a joint author of the Film." *Id*. ¶¶ 42-43. Alternatively, Gibel asks that the Court rule "Sandhu's individual contributions to the Film do not constitute a 'work of authorship' within the meaning of the Copyright Act to which Sandhu holds any copyright interest." *Id*. at ¶ 44.

### B. First Amended Answer and Countercomplaint

In her First Amended Answer and Countercomplaint (the "FACC"), Sandhu disputes

Gibel's characterization of her role in the Film's production and asserts that she:

> personally engaged in various forms of creative authorship, including (among other things): conception, creative direction, content selection, directing scenes, overseeing the Film's production, supervising the work of editors, filming scenes, editing footage, pitching the Film at film festivals, and collaborating on all other aspects of the Film's creation and promotion, including the overall arc and direction of the Film.

FACC ¶ 12. She alleges that "Gibel publicly represented that Ms. Sandhu was a coequal partner in the creation of the Film in correspondence with third parties and promotional materials for the Film," until the fall of 2018, when "Gibel began to dispute Ms. Sandhu's credits on the Film and acted to exclude Ms. Sandhu from further involvement with the Film." *Id*. at ¶¶ 13–14. She alleges that Gibel wrongfully "blocked Ms. Sandhu's access to the Film's promotional material and social media, and removed Ms. Sandhu's name from those materials," *id*. at ¶ 38, "removed Ms. Sandhu's access to the Google Drive location where they stored key documents for the Film," *id*. at ¶ 39, and "blocked Ms. Sandhu's access to grant funds jointly raised and awarded to the project," *id*. at ¶ 40. According to Sandhu, Gibel brought this action after she refused to withdraw the Film from consideration at Hot Docs Dealmaker Forum, a documentary event where Sandhu and Gibel had been offered the opportunity to pitch the Film. *Id*. at ¶¶ 43-47.

In the FACC, Sandhu asserts the following counterclaims: 1) a claim for declaratory judgment under the Copyright Act, 28 U.S.C. § 2201; 2) unjust enrichment; 3) intentional interference with prospective economic advantage; 4) false advertising and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) ("the Lanham Act counterclaim"); and 4) false advertising and unfair competition under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("the UCL counterclaim").

### C. The Motion

In the Motion, Gibel asks the Court to dismiss Sandhu's Lanham Act and UCL counterclaims, as well as her counterclaim for intentional interference with prospective economic advantage, arguing that these counterclaims fail to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). Motion at 1-2. Gibel argues that Sandhu's Lanham Act counterclaim is barred by the Supreme Court's ruling in *Dastar Corp. v. Twentieth Century Fox Film Corp.*,

3

539 U.S. 23 (2003). He also contends this claim fails because Sandhu has not alleged a required element of the claim, namely, that she engaged in "commercial advertising." *Id*. Nor can Sandhu remedy this defect by amendment, he contends, because the Film is still in development and no commercial advertising has yet occurred. *Id*. at 1. Gibel further asserts that because the UCL claim is based on and coextensive with Sandhu's Lanham Act counterclaim, the UCL counterclaim must be dismissed for the same reasons. *Id*. at 2. Gibel asserts that the counterclaim for intentional interference with prospective economic advantage should be dismissed because Sandhu has not alleged any conduct that is independently wrongful, as is required under California law. *Id*. Finally, Gibel contends the request for punitive damages must be dismissed because Sandhu has not alleged that Gibel acted with "oppression, fraud, or malice." *Id*. at 11–12.

## III. ANALYSIS

### A. Legal Standard Under Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B. The Lanham Act, *Dastar* and *Sybersound*

The purpose of the trademark protections set forth in the Lanham Act is to "avoid confusion in the marketplace by allowing a trademark owner to prevent[ ] others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003) (internal quotations and citation omitted). The Lanham Act achieves this objective by prohibiting false designation of a good's origin under § 43(a)(1)(A) and false or misleading commercial advertising about a good under § 43(a)(1)(B). Specifically, § 43(a)(1) provides as follows:

> 1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

In *Dastar*, the Supreme Court addressed the meaning of the term "origin of goods" under § 43(a)(1)(A) of the Lanham Act. There, an affiliate of plaintiff Twentieth Century Fox Film acquired the exclusive television rights to Dwight Eisenhower's account of the Allied campaign in Europe, "Crusade in Europe," and produced a television series by the same name. 539 U.S. at 25-26. The television series entered the public domain in 1977 when Fox failed to renew the copyright on the television series. *Id*. at 26. However, Fox reacquired the television rights – including the exclusive right to distribute the Crusade television series – in 1988. *Id*. Fox's affiliate then restored the negatives from the original series, repackaged and distributed them. *Id*. Subsequently, in 1995, defendant Dastar copied the original version of the Crusade television series (rather than the restored series), made some changes to the series, then sold the video set as its own, making no reference to the Crusade television series. Fox and its affiliate sued Dastar, alleging that Dastar's failure to give proper credit to the Crusade television series amounted to a false designation of origin in violation of § 43(a)(1)(A) of the Lanham Act.

The Court in *Dastar* rejected the plaintiff's argument, holding that the phrase "origin of goods" "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept or communication embodied in those goods." *Id.* at 37. The Court explained:

> We think the most natural understanding of the "origin" of "goods"– the source of wares – is the producer of the tangible product sold in the marketplace, in this case the physical Campaigns videotape sold by Dastar. The concept might be stretched (as it was under the original version of § 43(a)) to include not only the actual producer, but also the trademark owner who commissioned or assumed responsibility for ("stood behind") production of the physical product. But as used in the Lanham Act, the phrase "origin of goods" is in our view incapable of connoting the person or entity that originated the ideas or communications that "goods" embody or contain. Such an extension would not only stretch the text, but it would be out of accord with the history and purpose of the Lanham Act and inconsistent with precedent.

*Id*. In support of this conclusion, the Court reasoned that a broader definition of the "origin" of a good would run the risk of conflicting with the law of copyright, creating "a species of mutant copyright law that limits the public's 'federal right to "copy and to use"' expired copyrights.'" *Id*. at 34 (citation omitted).

The *Dastar* Court noted that its holding did not leave "creative talent of the sort that lay

6

behind the Campaigns videos . . . without protection." *Id*. at 37. In particular, the original film footage could have been copyrighted, or the plaintiff could have renewed the copyright it had held in the television series. *Id*. It went on to suggest, in dicta, that there would also be a remedy under the Lanham Act if:

> the producer of a video that substantially copied the Crusade series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series, then one or more of the respondents might have a cause of action—not for reverse passing off under the "confusion . . . as to the origin" provision of § 43(a)(1)(A), but for misrepresentation under the "misrepresents the nature, characteristics [or] qualities" provision of § 43(a)(1)(B).

*Id*. at 38.[2] Likewise, the *Dastar* Court noted (also in dicta) that the plaintiff's Lanham Act claim "would undoubtedly be sustained if Dastar had bought some of New Line's Crusade videotapes and merely repackaged them as its own." *Id*. at 31.

In *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1143 (9th Cir. 2008), the Ninth Circuit addressed the implications of *Dastar* for a claim brought under § 43(a)(1)(B) of the Lanham Act based on alleged misrepresentation of the "nature, characteristics, [and] qualities" of the product in that case. There, the defendants were producers of karaoke records who allegedly misrepresented to their customers that they had obtained synchronization licenses from all of the copyright holders with interests in the songs on the karaoke records. *Id*. The court considered whether misrepresentations about the licensing status of the records could be considered misrepresentations of the "nature, characteristics, [and] qualities" of the records for the purposes of § 43(a)(1)(B) and concluded they could not, looking to the reasoning in *Dastar*. *Id*. at 1144. The court explained:

> the nature, characteristics, and qualities of karaoke recordings under the Lanham Act are more properly construed to mean characteristics of the good itself, such as the original song and artist of the karaoke recording, and the quality of its audio and visual effects. Construing the Lanham Act to cover misrepresentations about copyright licensing status as Sybersound urges would allow competitors engaged in the distribution of copyrightable materials to litigate the underlying copyright infringement.

---

[2] "Reverse passing off" occurs where "[t]he producer misrepresents someone else's goods or services as his own." 539 U.S. at 27 n. 1 (citing *Williams v. Curtiss–Wright Corp*., 691 F.2d 168, 172 (3d Cir. 1982)).

7

*Id.*

## C. The Lanham Act Counterclaims

### 1. Contentions of the Parties

Gibel argues in the Motion that Sandhu's Lanham Act counterclaim is a reverse passing off claim under § 43(a)(1)(A) disguised as a claim for false advertising under § 43(a)(1)(B). Motion at 6. The reverse passing off claim is directly precluded by *Dastar*, he asserts, and the false advertising claim fails under *Sybersound*. *Id*. at 5-8. Gibel argues that numerous courts have relied on *Sybersound* to conclude that misrepresentations concerning authorship do not fall within the ambit of § 43(a)(1)(B) and those cases are on point here.

In her Opposition, Sandhu argues that *Dastar* does not bar her Lanham Act counterclaim because that case addressed only § 43(a)(1)(A) whereas she asserts her Lanham Act counterclaim is a claim for false advertising under § 43(a)(1)(B). Opposition at 7. She cites the dicta in *Dastar*, quoted above, suggesting that a claim for false advertising would be allowable under the Lanham Act where the defendant has simply taken someone else's product and repacked it as their own, arguing that this is what she has alleged here. *Id*. at 9 (citing *Dastar*, 539 U.S. at 31). Sandhu acknowledges that some courts have extended *Dastar* to find that it bars false advertising claims under § 43(a)(1)(B) but contends that they have done so only where there was a "clear showing" that the claims were "merely attempts to circumvent *Dastar* and in essence were claims for failure to provide credit on underlying creative content." *Id. at 9.* That is not the case here, Sandhu argues, where Sandhu's ownership in the Film by virtue of her "sweat equity" is a characteristic of the Film itself. *Id*. at 10-11. As a consequence, she contends, misrepresentations that the Film is only Gibel's are not simply misrepresentations about authorship but rather, relate to the "nature, characteristics [or] qualities" of the Film and therefore within the ambit of § 43(a)(1)(B). *Id*. Similarly, Sandhu argues *Sybersound* is distinguishable because that case involved misrepresentations only as to the franchise status of the product and not about a characteristic of the good itself. *Id*. at 10.

In addition, at the motion hearing, counsel for Plaintiff argued that Sandhu could state a claim for false advertising under § 43(a)(1)(B) of the Lanham Act based on alleged damage to her

8

reputation resulting from Gibel's conduct, citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). *See* FACC at ¶¶ 79-82 (alleging that statements Gibel made to potential funders of the Film about Sandhu damaged her reputation in the Bay Area documentary filmmaking community).[3]

### 2. Discussion

One need only look to the allegations of Sandhu's Lanham Act Counterclaim to conclude that the gravamen of that claim is Gibel's alleged failure to give Sandhu appropriate credit as a co-author in his statements made in promotional materials and on the Film website. In particular, the FACC alleges in the Lanham Act Counterclaim that "Gibel and Focal [P]oint have falsely represented and continue to falsely represent to public, potential funders, investors, potential purchasers, and/or others that the Film is Mr. Gibel's sole work, *without crediting Ms. Sandhu as his co-author*." FACC ¶ 76 (emphasis added). Although the Ninth Circuit has not directly addressed whether misrepresentations regarding authorship can give rise to a false advertising claim under § 43(a)(1)(B) of the Lanham Act, numerous district courts in California have concluded that under the reasoning of *Dastar* and *Sybersound* they cannot. *See Cannarella v. Volvo Car USA LLC*, No. 16 Civ. 6195, 2016 WL 9450451, at *9 (C.D. Cal. Dec. 12, 2016) (citing *Sybersound* and applying its reasoning to dismiss 15 U.S.C. § 1125(a)(1)(B) claim based on statements that allegedly misrepresented who invented technology that was being advertised); *Friedman v. Zimmer*, No. 15 Civ. 502, 2015 WL 6164787, at *3-4 (C.D. Cal. July 10, 2015) (citing *Sybersound* and applying its reasoning to dismiss 15 U.S.C. § 1125(a)(1)(B) claim based on statements advertising a film that allegedly misrepresented the nature, characteristics, qualities, or geographic origins of . . . goods, services, or commercial activities" by stating that the music in the film was by Hans Zimmer rather than by the plaintiff); *Grady v. Scholastic Inc.,* No. 12 Civ. 7992, 2013 WL 12132199, at *5 (C.D. Cal. Jan. 31, 2013) (citing *Sybersound* and applying its

---

[3] As discussed below, the Court finds that Sandhu's Lanham Act Counterclaim fails under *Daster* and *Sybersound*. Therefore, it does not summarize here Gibel's argument that the counterclaim fails for the independent reason that Sandhu has not alleged that any misrepresentations were made in "commercial advertising" because the Film has not been completed and no marketing of the Film has occurred.

9

reasoning to dismiss 15 U.S.C. § 1125(a)(1)(B) claim based on statements advertising a book that did not provide appropriate credit for the plaintiff's creative role in writing it); *Brion Jeannette Architecture v. KTGY Grp. Inc.*, No. 07 Civ. 691, 2009 WL 10673200, at *4 n.2 (C.D. Cal. July 30, 2009) (citing *Sybersound* and applying its reasoning to reject the plaintiff's argument that even if its reverse passing off claim under § 43(a)(1)(A) failed under *Dastar* it had a viable false advertising claim under § 43(a)(1)(B) where plaintiff alleged that the defendant used architectural designs by the plaintiff to promote his services while representing that the designs were his own); *see also Kehoe Component Sales Inc. v. Best Lighting Prod., Inc*., 796 F.3d 576, 590 (6th Cir. 2015) (citing *Sybersound* for the proposition that "[a]bsent a false statement about geographic origin, a misrepresentation is actionable under § 1125(a)(1)(B) only if it misrepresents the 'characteristics of the good itself'—such as its properties or capabilities" and concluding that the Lanham Act "does not encompass misrepresentations about the source of the ideas embodied in the object (such as a false designation of authorship); to hold otherwise would be to project the Lanham Act into the province of the Copyright and Patent Acts."); *Baden Sports, Inc. v. Molten USA, Inc*., 556 F.3d 1300, 1307 (Fed. Cir. 2009) ("Following *Sybersound*'s reasoning, we conclude that authorship, like licensing status, is not a nature, characteristic, or quality, as those terms are used in Section 43(a)(1)(B) of the Lanham Act.").

For example, in *Friedman v. Zimmer*, the Central District of California dismissed a false advertising claim similar to Sandhu's Lanham Act counterclaim. There, plaintiff Richard Friedman alleged that the defendants' film *Twelve Years a Slave* used a musical composition in the score to which he held the copyright and that the defendants violated the Lanham Act by falsely advertising that the film featured "Music by Hans Zimmer" instead of stating "Music by Richard Friedman." *Friedman v. Zimmer*, 2015 WL 6164787, at *3. As in this case, the plaintiff relied on dicta in *Dastar* to argue that "the Supreme Court left open the possibility of asserting a *Dastar*-type claim under section 1125(a)(1)(B)." *Id*. The court in *Friedman* rejected that argument, however, reasoning that the dicta in *Dastar* "states only that a *Dastar*-type claim might be viable if the seller's misrepresentation leads consumers to believe they were buying one product when they were really buying another." *Id*. at *4 (citing *Baden Sports, Inc. v. Molten USA,*

*Inc.*, 556 F.3d 1300, 1307 (Fed. Cir. 2009) ("While the dictum in *Dastar* might suggest that the Supreme Court left open the possibility of a claim arising from a misrepresentation concerning the qualities of certain goods, it does not necessarily suggest that claims based on false designation of authorship are actionable under Section 43(a)(1)(B).")).

The *Friedman* court reasoned further that "given the Court's concerns [in *Dastar*] about creating overlap between the Lanham Act and other intellectual property regimes, it would have made little sense for the Supreme Court to reject the *Dastar* plaintiff's claim under 15 U.S.C. § 1125(a)(1)(A) but permit the same sort of claim to be asserted under a different prong of the same statute." *Id*. (citing *Antidote Int'l Films, Inc. v. Bloomsbury Pub., PLC*, 467 F.Supp.2d 394, 400 (S.D.N.Y. 2006) ("[T]he holding in *Dastar* that the word 'origin' in § 43(a)(1)(A) refers to producers, rather than authors, necessarily implies that the words 'nature, characteristics, [and] qualities' in § 43(a)(1)(B) cannot be read to refer to authorship. If authorship were a 'characteristic[ ]' or 'qualit[y]' of a work, then the very claim *Dastar* rejected under § 43(a)(1)(A) would have been available under § 43(a)(1)(B).")). The *Friedman* court also found that the reasoning of *Sybersound* supported its conclusion, reading that case to support the conclusion that claims of false designations of authorship as false advertisement are not actionable under § 43(a)(1)(B) are not actionable in the Ninth Circuit. *Id*.

This Court, like the court in *Friedman,* concludes that under *Dastar* and *Sybersound*, Sandhu's Lanham Act Counterclaim under § 43(a)(1)(B) fails to state a claim because it is based on misrepresentations of authorship. The Court also rejects Sandhu's attempt to distinguish her claim from the claim asserted in *Sybersound* on the basis that the alleged false statements here are about co-ownership rather than authorship. As discussed above, although numerous courts have read *Sybersound* to preclude false advertising claims based on misleading statements about the authorship of the underlying ideas in the product, *Sybersound* itself did not involve false designation of authorship. Rather, it involved alleged misrepresentations about the *licensing status* of the material contained on the records. Sandhu does not explain why the distinction she draws – between misrepresentation as to ownership of the Film and misrepresentation as to the licensing status of the songs on the records in *Sybersound* – is meaningful. Moreover, the Court

11

finds nothing in the reasoning of *Sybersound* that suggests that the court in that case would have reached a different result if faced with the alleged facts of this case.

The Court also is not persuaded that Sandhu has stated a claim for false advertising based on injury to reputation under *Lexmark*. In that case, the plaintiff (Lexmark) manufactured printers and ink cartridges, while the defendant (Static Control) was a "remanufacturer" – that is, a company that "acquire[d] used Lexmark toner cartridges, refurbish[ed] them, and [sold] them in competition with new and refurbished cartridges sold by Lexmark." 572 U.S. at 120. Lexmark asserted copyright claims against Static Control and Static Control, in turn, asserted false advertising counterclaims under the Lanham Act against Lexmark. *Id.* In particular, Static Control alleged that Lexmark was misleading end-users of its cartridges that they were required to return their used cartridges to Lexmark and advising them that it was illegal to have its cartridges refurbished by Static Control. *Id.* at 123. Static Control alleged that Lexmark "materially misrepresented 'the nature, characteristics, and qualities'" of both its own products and Static Control's products" under § 1125(a)(1)(B) and "that Lexmark's misrepresentations . . . had substantially injured [its] business reputation by leading consumers and others in the trade to believe that [Static Control] is engaged in illegal conduct." *Id.* The Supreme Court granted certiorari "to decide the appropriate analytical framework for determining a party's standing to maintain an action for false advertising under the Lanham Act." *Id.* at 125 (internal quotation marks omitted).

The Court articulated a two-part test for determining whether a plaintiff has standing under the Lanham Act to bring a false advertising claim. *Id.* at 129-134. First, the plaintiff's interests must fall within the "zone of interest" that Congress meant to protect under the Lanham Act. *Id.* at 129-132. The Court found that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32. The Court explained that to satisfy this requirement it is not enough for customers to allege that they have been "hoodwinked into purchasing a disappointing product" or for a business to allege that it has been "misled by a supplier into purchasing an inferior product." *Id.* Second, the plaintiff "must show economic or reputational injury flowing directly from the

12

deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id*. at 133. When both prongs of the test are met, a plaintiff has standing under the Lanham Act to bring an action for reputational harm based on false advertising. *Id.*

In her Lanham Act counterclaim, Sandhu alleges that Gibel "irreparably harmed Ms. Sandhu's reputation and good will within the documentary filmmaking community, including among the public, potential funders, investors, potential purchasers of the Film, and/or others in this community." FACC at ¶ 79. However, the specific facts she alleges to establish that she has suffered reputational harm make clear that the harm she alleges is the result of representations by Gibel about Sandhu's role as a coauthor of the Film. *See* FAC ¶ 75 (alleging that Gibel "removed Ms. Sandhu's name from the Film's promotional material, website, and social media),[4] ¶ 76 (alleging that Gibel "falsely represented . . . to public, potential funders, investors, potential purchasers and others that the Film is Mr. Gibel's sole work, *without crediting Ms. Sanhu as his coauthor*); ¶ 77 (alleging that Gibel "falsely represented . . . that Ms. Sandhu was never substantively involved in the conception and creation of the film . . . and that she *has claimed credit that is not due her*); ¶ 78 (alleging Gibel's statements contradicted prior statements that Sandhu was his "filmmaking partner"); ¶ 80 (alleging that an investor who Sandhu had "cultivated" declined to fund the film after being made aware of Gibel's claim of "sole authorship" "*citing confusion caused by Mr. Gibel's claim of sole authorship*"); ¶ 82 (alleging that Gibel intends to continue "tarnish[ing] Ms. Sandhu's good name and reputation in the community" by "*continu[ing] to promote the Film . . . as Mr. Gibel's sole work*"); ¶ 83 (alleging that Gibel's "claim that the Film is Mr. Gibel's sole work" is discouraging some investors from investing in the Film because "[a] reasonable person within the documentary filmmaking community would attach importance to *the identity of the authors of a film* and would be induced to act on the information in making decisions"); ¶ 84 (alleging that Gibel's "omission of Ms.

---

[4] In Paragraph 75, Sandhu also alleges that Gibel "blocked access to those promotional materials and social media outlets." Sandhu has cited no authority suggesting that this conduct, by itself, constitutes false advertising (or even that it is advertising).

13

Sandhu, and . . . false attribution of Mr. Gibel as the Film's sole author, *misrepresents the 'nature, characteristics [or] qualities' of the Film and Mr. Gibel and Ms. Sandhu's respective authorship and creative contributions thereto"* which is likely to mislead consumers "by creating the false and misleading impression that Mr. Gibel is the source of Ms. Sandhu's creative work, and the *sole author of the Film which Ms. Sandhu co-authored*."). Therefore, the Court concludes that Sandhu's Lanham Act counterclaim runs afoul of *Dastar* and *Sybersound* despite her attempt to recast it as a false advertising claim based on reputational harm. While it may be possible to amend this claim to allege injury to a commercial interest in reputation that is not a result of representations about Sandhu's authorship of the Film, she has not done so in the FACC. Therefore, the Court dismisses this claim with leave to amend.

### D. The UCL Counterclaim

#### 1. Contentions of the Parties

In the Motion, Gibel argues that Sandhu's UCL counterclaim "essentially repeats" the Lanham Act counterclaim. Motion at 9. Because section 17200 is "substantially congruent'" to the Lanham Act, he contends, the UCL counterclaim should be dismissed for the same reasons the Lanham Act claim must be dismissed. *Id.* (*citing Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)). He points to cases in which "courts dismissing Lanham Act claims based on authorship—including the Ninth Circuit in *Sybersound*—have dismissed Section 17200 claims on the same grounds." *Id.* (citing *TV One LLC v. BET Networks*, No. CV 11-08983 MMM (EX), 2012 WL 13012674, at *9 (C.D. Cal. Apr. 2, 2012); *Cannarella v. Volvo Car USA LLC*, No. CV 16-6195-RSWL-JEMX, 2016 WL 9450451, at *11 (C.D. Cal. Dec. 12, 2016)).

In her Opposition, Sandhu rejects Gibel's argument that her UCL counterclaim simply duplicates her Lanham Act Claim. Opposition at 11-13. According to Sandhu, "California's UCL is broader than the Lanham Act." *Id*. at 14 (quoting *Card Tech Int'l, LLLP v. Provenzano*, No. CV 11-2434 DSF (PLAx), 2012 WL 2135357, at *28 (C.D. Cal. June 7, 2012)). She further notes that there are four disjunctive prongs of § 17200 that can give rise to liability, namely, conduct that is: (1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation of section 17500 (false or misleading advertisements), and argues that she has adequately pled UCL violation under both

14

the "unlawful" prong and the "unfair" prong. *Id.* (*citing Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007)). With respect to the "unlawful" prong, she claims she has adequately alleged unlawful conduct based not only upon her Lanham Act Counterclaim (which she contends is sufficiently pled for the reasons discussed above) but also on each of her other counterclaims. *Id*. at 13. She also points out that in the FACC she asserted her UCL claim based not only on "unlawful" conduct but also based on "unfair" conduct. *Id*. at 13-14. She argues that she has alleged "numerous 'unfair' acts as a basis for her UCL claim including: 'removing and blocking Ms. Sandhu's access to key documents, materials, and footage for the Film' [FACC ¶ 91); 'preventing [Sandhu] from promoting the Film and her work to the public' (*id*.); 'diminishing [Sandhu's] contribution' (*id*. ¶ 92); 'portraying [Ms. Sandhu] as an unwanted interloper to [Gibel's] project' (*id*.); and 'representing the Film as . . . Gibel's sole work' (*id*. ¶ 94)." *Id.* at 14.

In his Reply, Gibel reiterates his argument that Sandhu's UCL counterclaim duplicates her Lanham Act counterclaim and is therefore barred for the same reasons the Lanham Act counterclaim fails. Reply at 7. In particular, he argues that any UCL claim for false advertising Sandhu is asserting is equivalent to a claim under 15 U.S.C. § 43(a)(1)(B) and therefore is barred by *Sybersound*; likewise, any unfair competition claim she is asserting under the UCL is equivalent to a claim under § 43(a)(1)(A) and is barred under *Dastar*. *Id*. Gibel rejects the argument that Sandhu has pled violations of the UCL under the "unlawful" or "unfair prong", arguing that as pled, the only alleged violation of the UCL is that Gibel has denied she is a co-author of the Film, which is identical to her Lanham Act counterclaim. *Id*. He also argues that Sandhu's reliance on allegations that she was denied access to documents, materials and footage and prevented from promoting the Film "merely repeats her claim of joint authorship under the Copyright Act, because these are rights she would only have if she establishes her claim of joint authorship." *Id*. at 8 n. 1. Finally, Gibel argues that to the extent that Sandhu's UCL claim is based on her "purported joint authorship or any privileges of joint authorship, that claim would also be preempted by the Copyright Act." *Id*.

**2. Discussion**

California's UCL broadly prohibits unlawful, unfair, and fraudulent business acts. *Kor.*

*Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003). "Unlawful acts are anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made, where court-made law is, for example a violation of a prior court order." *Sybersound*, 517 F.3d at 1151 (ellipsis in original) (internal quotation marks omitted). "Unfair acts among competitors means 'conduct that threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Id*. at 1152 (quoting *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 187 (1999)). "Finally, fraudulent acts are ones where members of the public are likely to be deceived." *Id*.

Sandhu argues that she has asserted a viable UCL claim under both the "unlawful" and "unfair" prongs. The Court finds her arguments unpersuasive.

With respect to the "unlawful" prong, Sandhu's UCL claim fails to the extent it is based on alleged violations of the Lanham Act. The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (citing *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.1991)). Thus, Sandhu's UCL counterclaim fails for the same reasons her Lanham Act counterclaim fails to the extent it is based on alleged violation of the Lanham Act. *See Sybersound*, 517 F.3d at 1153 (dismissing UCL claim because the plaintiff could not state a claim under the Lanham Act).

The Court also rejects Sandhu's reliance on the "unfair" prong of the UCL. Sandhu has not alleged any "incipient violation of an antitrust law, or [conduct that] violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Id*. at 1152 (quoting *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 187 (1999)). Although she has alleged that Gibel's conduct has resulted in "substantial injury . . . to consumers," FACC ¶ 95, she does not allege any specific facts that give rise to a plausible inference that such harm has occurred or is

16

likely to occur. At most, she has plausibly alleged that Gibel's conduct has "misled . . . potential investors in the Film and members of the documentary filmmaking community." *Id. ¶ 94*.

Therefore, the Court dismisses Sandhu's UCL counterclaim with leave to amend on the basis that it fails to state a claim.

### E. The Intentional Interference with Prospective Economic Relations Counterclaim

#### 3. Contentions of the Parties

Gibel asserts Sandhu's counterclaim for intentional interference with prospective economic relations fails to state a claim because Sandhu has not alleged an independent wrong, which is required in California. Motion at 10 (*citing Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 385 (1995); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1159 (2003); *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1429 (9th Cir. 1993) *cert. denied* 510 U.S. 1197 (1994)). Sandhu counters that she "has pled at least two such independent wrongs . . . (1) Focal Point's unjust enrichment at Ms. Sandhu's expense, and (2) Focal Point's diminishment of Ms. Sandhu's copyright ownership." Opposition at 14–15 (internal citations omitted).

#### 4. Discussion

Under California law, the required elements of a claim for intentional interference with a prospective economic advantage are:

> (1) an economic relationship containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the defendant's acts.

*Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1429 (9th Cir. 1993) (*citing Buckaloo v. Johnson*, 14 Cal.3d 815 (1975)). In addition, "a plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). The Ninth

17

Circuit has explained that a plaintiff:

> need not allege acts by [the defendant] different from the alleged [interference with the relationship] to allege a wrongful act giving rise to a claim for interference with prospective economic advantage. [The plaintiff] merely must allege that [the defendant's] acts were unlawful for a reason other than that they interfered with [the plaintiff's] prospective economic advantage.

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1110 (9th Cir. 2007) (citing *Korea Supply Co.*, 29 Cal.4th at 1158–59).

The Court finds that Sandhu has not alleged any conduct that is independently wrongful. To the extent she relies on her claim for unjust enrichment, she does not cite any case in which the assertion of such a claim was found to satisfy the "independent wrong" requirement. "[I]n California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350 (2010); *Jogani v. Superior Court*, 165 Cal.App.4th 901, 81 Cal.Rptr.3d 503, 511 (2008)). "Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient." *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011). Sandhu's counterclaim for unjust enrichment is based on the theory that Sandhu worked without compensation because she understood that she would, as co-creator, receive a share of the profits. FACC ¶¶ 58-63. It does not establish that Gibel's conduct was *independently* wrongful.

The Court also rejects Sandhu's argument that her declaratory judgment claim under the Copyright Act meets the independent wrong requirement. While she characterizes her claim as one for "diminishment of copyright interest," it is, in fact, simply a claim seeking a declaratory judgment as to her copyright interest. Sandhu has cited no authority that a claim seeking a declaratory judgment regarding joint copyright ownership is sufficient to meet the independent wrong requirement. Further, the Court finds that her allegation that Gibel "threatened legal action unless Ms. Sandhu withdrew from the Hot Docs event," FACC ¶ 68, does not allege an independent wrong. *See Arthur J. Gallagher & Co. v. Lang, No*. C 14-0909 CW, 2014 WL 6816644, at *3 (N.D. Cal. Dec. 3, 2014) ("[T]he conduct [the plaintiff] describes in the first two

18

1 causes of action—contacting clients and filing a lawsuit—are not independently wrongful acts and
2 [the plaintiff] does not cite any legal authority upon which the Court could conclude otherwise.").

Therefore, the Court finds that Sandhu has failed to state a claim as to her counterclaim for intentional interference with prospective economic relations. Because she may be able to cure this deficiency if she is able to amend to state a viable claim under the Lanham Act (which would satisfy the independent wrong requirement as well), Sandhu will be given leave to amend this claim.

### F. Punitive Damages

Gibel argues that Sandhu's request for punitive damages should be dismissed because punitive damages are not available under the Lanham Act and as to her state law counterclaims, Sandhu has not alleged in even a conclusory fashion that he acted with malice or fraudulent intent. The Court agrees.

California state law controls the substantive elements that Sandhu must plead in her request for punitive damages. *California Spine & Neurosurgery Inst. v. Aetna Life Ins. Co.*, No. CV 18-6829-DMG (KSX), 2019 WL 1878355, at *2 (C.D. Cal. Mar. 7, 2019). Under Cal. Civ. Code § 3294, she must plead malice, fraud, or oppression to receive punitive damages. However, the heightened pleading standard that applies in state court under this provision does not apply in Federal court; rather, under Rules 8 and 9(b) malice, fraud and oppression may be averred generally. *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 273 (N.D. Cal. 2015).

Sandhu has not included even conclusory allegations that Gibel acted with malice or fraudulent intent. Though this deficiency could be easily remedied by amendment, her request for punitive damages also fails to the extent that punitive damages are not available on either of her remaining claims. First, punitive damages are not available under the Copyright Act. *Reinicke v. Creative Empire*, LLC, No. 12CV1405-GPC KSC, 2013 WL 275900, at *5 (S.D. Cal. Jan. 24, 2013) ("The Court follows the district courts in this Circuit that hold that punitive damages are not available under the Copyright Act."). Second, Sandhu has cited no authority for the proposition that punitive damages are available on a claim for unjust enrichment. Therefore, the Court dismisses Sandhu's request for punitive damages. However, to the extent that Sandhu may be able

19

to cure her Lanham Act claim and thereby also state a claim for intentional interference with prospective economic relations (which *does* allow for an award for punitive damages), Sandhu will be permitted to amend as to her request for punitive damages. *See Anglo-Am. Gen. Agents v. Jackson Nat. Life Ins. Co.*, 83 F.R.D. 41, 45 (N.D. Cal. 1979) ("punitive damages may be awarded for the tort of intentional interference with economic relations.").

### IV. CONCLUSION

For the reasons stated above, the Motion to Dismiss is GRANTED. The Court dismisses Sandhu's Third, Fourth and Fifth Counterclaims with leave to amend. Sandhu's amended counterclaims shall be filed no later than January 24, 2020.

**IT IS SO ORDERED.**

Dated: December 20, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge