UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOCAL POINT FILMS, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>ARJOT SANDHU,<br><br>        Defendant. | Case No. 19-cv-02898-JCS<br><br>**ORDER RE:**<br><br>**1. GIBEL'S MOTION TO EXCLUDE/STRIKE EXPERT TESTIMONY OF SANDHU EXPERTS SARAH (SALLY) RUBIN AND SARA RINKE (Dkt. No. 73)**<br><br>**2. GIBEL'S MOTION TO PRECLUDE EVIDENCE OF DAMAGES RELATING TO SANDHU'S CLAIM FOR UNJUST ENRICHMENT AND FOR PARTIAL SUMMARY JUDGMENT ON THAT CLAIM (Dkt. No. 74)**<br><br>**3. SANDHU'S DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF VIVIAN KLEIMAN (Dkt. No. 75)** |

**I.    INTRODUCTION**

In this action Plaintiffs and Counterdefendants Focal Point Films and Bryan Gibel (collectively, "Gibel") and Defendant and Counterclaimant Arjot Sandhu ("Sandhu") seek a declaratory judgment under the Copyright Act, 28 U.S.C. § 2201, with respect to the authorship of an as-of-yet unfinished documentary film entitled *Sign My Name to Freedom* ("the Film").  In addition, Sandhu asserts a counterclaim for unjust enrichment.  Presently before the Court are the following motions: 1) Gibel's Motion To Exclude/Strike Expert Testimony Of  Sandhu Experts Sarah (Sally) Rubin and Sara Rinke ("Gibel's *Daubert* Motion"); 2) Gibel's Motion to Preclude

1 Evidence of Damages Relating to Sandhu's Claim for Unjust Enrichment and for Partial
2 Summary Judgment on that Claim ("Gibel's Summary Judgment Motion"); and 3) Sandhu's
3 *Daubert* Motion to Exclude the Testimony of Vivian Kleiman ("Sandhu's *Daubert* Motion").
4 The Court will also address the question of bifurcation, which it asked the parties to brief at the
5 previous case management conference. A hearing on the motions was held on September 25,
6 2020 at 9:30 a.m. The Court's rulings are set forth below.[1]

## II. GIBEL'S SUMMARY JUDGMENT MOTION

### A. Background

In his summary judgment motion, Gibel asks the Court to dismiss Sandhu's unjust enrichment claim on the basis that Sandhu did not timely disclose the underlying theory for that claim, namely, that she is entitled to compensation for the reasonable value of her work on the Film. He further contends the claim must be dismissed because to the extent Sandhu asserts the unjust enrichment claim in order to recover her share of the profits on the Film, it is undisputed that no profits have been earned on the Film. He relies on Rule 37(c) of the Federal Rules of Civil Procedure in support of the first argument and Rule 56 in support of the second argument. Sandhu does not dispute that the Film has not generated any profits and stipulated at oral argument that she is not seeking to recover her share of profits under the unjust enrichment claim. She contends, however, that her disclosures were adequate and timely with respect to the theory that she is entitled compensation for her work on the Film. The Court agrees and therefore DENIES Gibel's Summary Judgment Motion.

### B. Legal Standards

Under Federal Rule of Civil Procedure 26(a)(1)(A), a party must "provide to the other parties . . . a computation of each category of damages claimed by the disclosing party—who must also make available for inspection or copying as under Rule 34 the documents or other evidentiary material, . . . on which each computation is based. . . ." Fed. R. Civ. P. 26(a)(1)(A)(iii). In addition, Rule 26(e)(1)(A) requires that:

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

> A party who has made a disclosure under Rule 26(a) ... must supplement or correct its disclosure or response ... in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e)(1)(A).

Federal Rule of Civil Procedure 37(c)(1) "'forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.'" *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). Rule 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1). "[L]ower courts are entrusted with 'particularly wide latitude' in exercising this discretion to impose sanctions under Rule 37(c)." *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 242 (D. Nev. 2017) (quoting *Yeti by Molly*, 259 F.3d at 1106). The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless. *R & R Sails*, 673 F.3d at 1246 (citing *Torres v. City of L.A.*, 548 F.3d 1197, 1213 (9th Cir. 2008)).

**C.  Discussion**

Gibel argues that preclusion sanctions should be imposed as to Sandhu's unjust enrichment claim to the extent she seeks to recover the value of her work on the Film because "[s]he did not allege this theory of damages in her initial counterclaim or amended counterclaim, nor did she disclose it in her initial disclosures or even her amended initial disclosures, served after the close of fact discovery." Motion at 1. According to Gibel, "[i]t was only after the close of fact

3

discovery, in an expert report, that Sandhu, for the first time, indicated that she intended to seek damages at trial based on the time value of her work, in addition to an accounting or disgorgement of profits as a co-author." *Id.* The record does not support Gibel's argument however.

First, it has been clear at least since Sandhu filed her Amended Answer and Counterclaims, Docket No. 20 ("Amended Answer"), that in asserting her unjust enrichment counterclaim she was seeking to recover compensation for her work on the Film. *See* Amended Answer at ¶ 62 (alleging as part of her unjust enrichment counterclaim that "Sandhu did not receive compensation for her services as an author, producer, cinematographer, director, editor, photographer, or promoter of the Film as would be typical for a work-for-hire employee"); ¶ 63 (alleging as part of her unjust enrichment counterclaim that Gibel "retain[ed] the benefit of Ms. Sandhu's work—including sole access to footage Ms. Sandhu shot and the website she created—without having compensated her for the reasonable value of her contributions"); Prayer, ¶ 3 (seeking compensatory damages). Sandhu reiterated that she was seeking compensatory damages in her case management conference statements. *See* Docket No. 34 at 8 (seeking "[a]n award of damages, including but not limited to compensatory and punitive damages"); Docket No. 47 at 10 (same); Docket No. 60 at 1-2 (seeking "[a]n award of damages, including but not limited to compensatory damages . . . in an amount to be determined at trial.").

Moreover, statements made by Gibel in this litigation confirm that he has long understood that Sandhu was asserting her unjust enrichment claim on this theory. *See, e.g.*, Docket No. 31 (Motion to Dismiss) at 1 ("Focal Point also does not move to dismiss Sandhu's claim for unjust enrichment, as Focal Point has always acknowledged Sandhu's right to be paid for her work."); Docket No. 39 (Reply on Motion to Dismiss) at 1 ("To be clear, Focal Point is not seeking to hold Sandhu back from having her real complaint—that she is being denied her rights as an alleged joint author of the Film—heard through her declaratory judgment counterclaim, *or even from being paid for the value of the work she contributed to the Film through her unjust enrichment counterclaim*") (emphasis added); Docket No. 34 (Case Management Statement) at 10 ("Third, adjudication of the declaratory judgment claims would resolve all issues in this case, with the exception of Sandhu's claim for unjust enrichment. That claim, *by which Sandhu seeks*

4

1   *compensation for the services she provided*, should be bifurcated and tried once the Court decides
2   the ownership issue.") (emphasis added); Docket No. 47 (Case Management Conference
3   Statement) at 12 (same). Thus, Gibel's claim that he was unaware of this theory rings hollow.[2]
4          The Court also rejects Gibel's argument that Sandhu's disclosure of her damages
5   calculation was untimely. Sandhu's initial disclosure did not contain a damages calculation with
6   respect to her unjust enrichment claim. Rather, she disclosed that she sought "compensatory . . .
7   damages" but stated, "the amount of damages arising from Focal Point's unlawful conduct is not
8   ascertainable at this time," and the computation of damages "may require expert testimony and
9   discovery." *See* Docket 74-2 (Goldman Decl., Ex. A (Sandhu's Initial Disclosures) at 6. Given the
10  early stage of the case, this disclosure was sufficient at the time it was made to meet Sandhu's
11  obligations under Rule 26. *See Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. at 240–41
12  (recognizing that "[a] computation of damages may not need to be detailed early in the case before
13  all relevant documents or evidence has been obtained by the plaintiff.")(citing *Cardoza v.*
14  *Bloomin' Brands, Inc.*, Case No. 2:13-cv-1820-JAD-NJK, 2015 WL 3875916, at *2 (D. Nev. June
15  22, 2015) (quoting *LT Game Int'l Ltd. v. Shuffle Master, Inc.*, Case No. 2:12-cv-01216-GMN-
16  GWF, 2013 WL 321659, at *6 (D. Nev. Jan. 28, 2013))). The only question, then, is whether
17  Sandhu's supplementation of her disclosures in the form of an expert report containing detailed
18  damages calculations, which was produced after the close of discovery but in compliance with the
19  deadline set by the Court for exchanging expert reports, was timely.
20         Where supplementation of initial disclosures is required, it must be done in "a timely
21  manner." Fed. R. Civ. P. Rule 26(e)(1). The "rule does not limit the time for supplementation of
22  prior disclosures to the discovery period." *Copper Sands Homeowners Ass'n v. Copper Sands*
23  *Realty*, 2013 WL 2460349, at *2 (D. Nev. June 5, 2013) (citation omitted). Rather, ""'[t]iming is

---

[2] Inexplicably, Gibel makes no mention in his reply brief of his repeated statements throughout this case acknowledging that Sandhu was seeking compensation for her work through her unjust enrichment claim, even though these statements were highlighted in Sandhu's opposition brief. Instead, he argues even more emphatically that he was unaware of the theory. For example, in response to Sandhu's argument that Gibel engaged in virtually no discovery on this theory despite being aware of it, Gibel responded, "it is difficult to see why [he] would have thought to conduct discovery on a damages theory that Sandhu **never disclosed**." Reply at 4 (emphasis in original).

better gauged in relation to the availability of the supplemental information," and not merely based on whether the information was provided after the discovery deadline.'" *Am. Gen. Life Ins. Co. v. Vistana Condo. Owners Ass'n*, No. 212CV01324JADNJK, 2016 WL 1611585, at *2 (D. Nev. Apr. 21, 2016) (quoting *Calvert v. Ellis*, 2015 WL 631284, *3 (D. Nev. Feb. 12, 2015) (quoting *Dayton Valley Inv'rs, LLC v. Union Pac. R. Co.*, No. 2:08-CV-00127-ECR, 2010 WL 3829219, at *3 (D. Nev. Sept. 24, 2010))). Here, the record shows that Sandhu's damages calculation required discovery of the General Ledger for the Film and deposition testimony to address the accuracy and completeness of the ledger; it also required an expert to analyze this information for the purposes of calculating damages. Given that Sandhu's theory was apparent to Gibel from early in the cases -- as was her discovery aimed at developing a damages calculation -- the Court finds that her disclosure of her damages calculation in an expert report that was produced by the deadline set by the Court satisfied Sandhu's obligation to supplement her disclosures in a timely manner. *See Vistana Condo. Owners Ass'n*, 2016 WL 1611585, at *2 (holding that the defendant's supplementation was not untimely and did not violate Rule 26(3) where its "damages calculation [was] known to the [plaintiffs] through the discovery process and via [the defendant's] expert disclosure"); *Naxos, LLC v. American Family Insurance Company*, No. C18-1287JLR, 2020 WL 106740 (W.D. Wash. Jan. 9, 2020) (holding that an expert report produced in compliance with the court's case schedule satisfied the plaintiff's obligations under Rule 26(e)); *see also Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241 (D. Nev. 2017) ("There is no bright line rule that such supplementation [a damages calculation] is improper if made after the expert disclosure deadline or even after the close of discovery.").

Finally, even if Sandhu's supplementation as to the damages calculation was not timely, sanctions are not warranted under Rule 37(c). Under Rule 37(c), information that was not properly disclosed may be presented at trial if the parties' failure to disclose it was substantially justified or harmless. Fed.R.Civ.P. 37(c)(1); *Yeti by Molly, Ltd.*, 259 F.3d at 1106. Here, to the extent the damages calculation was not timely disclosed the error was harmless. Gibel had in his possession the General Ledger that is one of the main documents Sandhu's expert relied upon in calculating damages. In addition, to the extent some of the information (namely, the time she

spent on the Film) was in Sandhu's possession, Gibel deposed Sandhu and could have addressed this question but failed to do so. Although Gibel now claims he was unaware of Sandhu's theory and therefore could not be expected to have addressed the question in discovery, that representation is not credible. As his repeated statements make clear, he was fully aware that this was the theory on which Sandhu's unjust enrichment was based. As a consequence, the supposed late disclosure of the damages computation was not the cause of any harm to Gibel.

Accordingly, the Court DENIES Gibel's Summary Judgment Motion.

### III.   WHETHER TO BIFURCATE THE TRIAL

Having considered the briefs provided by the parties, the Court also concludes that Sandhu's unjust enrichment claim is a legal claim to which a jury trial right attaches. Further, because the unjust enrichment claim and the declaratory judgment claims share common factual questions, the Court finds that they can and should be tried together. The Court rejects Gibel's request to bifurcate the trial. While the declaratory relief claims are equitable, they can be tried at the same time as the unjust enrichment claim. The court will decide later whether the jury will be asked for an advisory verdict on the equitable claims, and what form that inquiry and verdict might take.

### IV.   THE DAUBERT MOTIONS

#### A.   Legal Standards Under Rule 702 and *Daubert*

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the Supreme Court described the relevant inquiry as follows:

7

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id*. (quoting Webster's Third New International Dictionary 1252 (1986)). The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met. *Id*. at 593. These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*"). However, when such evidence is not available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how they went about reaching their conclusions and point[ing] to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id*. at 1319.

The second requirement under Rule 702, that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," "goes primarily to relevance." *Id*. at

8

591. This is a question of "fit," and "is not always obvious." *Daubert*, 509 U.S. at 591. The Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id*. To meet this requirement there must be "a valid scientific connection to the pertinent inquiry." *Id*. In other words, the expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. This requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal., 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at 1321 n. 17). In particular, expert testimony "'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id*. (quoting *Daubert*, 509 U.S. at 595 (citation omitted)). "Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Id*. (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

**B.    Gibel's *Daubert* Motion**

  **1.    Background**

Sandhu retained experts Sally Rubin and Sara Rinke to testify in support of her claims. Rubin was retained to opine on whether Sandhu is a joint author of the Film. Goldman Decl., Ex. A (Rubin Report) at 1. In her report, Rubin concludes that Sandhu is a joint author of the Film based on her understanding of Sandhu and Gibel's "respective contributions and control over the Film's direction, content, and success." *Id.* The report includes a detailed fact section summarizing Rubin's understanding of the facts and citing extensive evidence in the record; a description of Rubin's qualifications; a summary of conclusions in which she concludes that Sandhu 1) is a joint author, and 2) is entitled to damages on her unjust enrichment claim; a section describing the "norms and conventions of the documentary film industry";  a section describing Rubin's understanding of the legal standards that apply to joint authorship;  and a discussion of how those standards apply to the facts here and why Rubin believes Sandhu is a joint author.

Rinke was retained "to prepare analyses to assist the Court and/or jury in considering the appropriate amount of damages that may be recoverable by Ms. Sandhu should Focal Point be

found liable for the counterclaims asserted against it." *Id.*, Ex. C (Rinke Expert Report) at 2. In her report, Rinke addresses: 1) the value of Sandhu's equity stake if she is a co-author; 2) the value of Sandhu's work on the Film regardless of whether she is a co-author; and 3) expenses for which Sandhu should be reimbursed. *Id.* With respect to the first issue, Rinke acknowledges that the Film has not yet earned any revenue and therefore "there are no quantifiable damages related to the value of Ms. Sandhu's equity stake as a co-owner at this point in time." *Id.* at 8. She offers a sample calculation of Sandhu's equity share based on hypothetical profits that the Film might earn in the future. *Id.*

Gibel asks the Court to exclude some of the opinions in Rubin's expert report and to preclude Rinke from offering any testimony at trial. As to Rubin, Gibel argues that: 1) opinions in her expert report that reach the ultimate question of joint authorship are improper because such determinations are reserved for the trier of fact; 2) her recitation of the facts relating to the parties' respective roles in the Film is improper because such information should be introduced through documentary evidence and testimony of percipient witnesses and not through an expert; and 3) her descriptions of the law is not a proper subject for expert opinion as it is the Court's job to instruct the jury on the law. Gibel concedes that Rubin may offer opinions about the norms and conventions of the film industry.

As to Rinke, Gibel argues that her opinions are "grade-school arithmetic" that do not require expert testimony and should therefore be excluded. He also argues that Rinke's opinions with respect to the damages to which Sandhu is entitled if she is a co-author are speculative and therefore should be excluded on that basis as well.

**2. Discussion**

  a. Rubin

    i. Descriptions of the law and ultimate conclusions

In her report, Rubin offers numerous opinions with respect to the ultimate legal question to be decided with respect to Gibel's authorship claim, namely, whether Sandhu was a co-author. *See, e.g.,* Rubin Expert Report at 1 ("It is my opinion that Ms. Sandhu is a joint author of the Film"); 10 ("Ms. Sandhu is a joint author of *Sign My Name to Freedom*"); 20 ("Ms. Sandhu and

Mr. Gibel are joint authors of the Film *Sign My Name to Freedom*"); 45 ("[I]t is my opinion that Ms. Sandhu and Mr. Gibel are joint authors of the film."). She also offers opinions as to whether the particular factors that courts consider in determining whether there is joint authorship support her conclusion that Gibel and Sandhu were joint authors. *See, e.g., id.* at 10 (opining that Gibel and Sandhu "made objective manifestations of a shared intent to become coauthors[,]" that Sandhu "exercised control over the Film, alongside . . . Gibel;" and that the "audience appeal of the Film is attributable to . . . Sandhu's contributions."). In addition, Rubin describes her understanding of the legal standards that she applies in her report to reach these conclusions. *Id.* at 19-20.

It is well-established that expert witnesses may not explain the law to the jury or tell the jury how to apply the law to the facts of the case. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008). Nor may an expert witness "give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Elsayed Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1065 n. 10 (9th Cir. 2002), amended sub nom. *Mukhtar v. California State Univ., Hayward*, 319 F.3d 1073 (9th Cir. 2003), and overruled on other grounds by *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014). On the other hand, "expert testimony concerning an ultimate issue is not per se improper." *Id.* (noting that Federal Rule of Evidence 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). Further, courts have recognized that experts may express facts or opinions using "legal terminology." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d at 1058-59.

Here, the Court will not permit Rubin to testify on the ultimate legal question, namely, whether Sandhu is a joint author. As this is a legal question that the Court must decide, testimony on this question will not be helpful to the jury. Rather, it is more likely that it will confuse the jury. The Court defers ruling on Gibel's remaining challenges on these grounds until trial, however, as the Court will be better able to determine where to draw the line in that context. *See Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF, 2020 WL 533006, at *1 (N.D. Cal. Feb. 3, 2020) ("In many instances . . . rulings 'should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context.'") (quoting *United States v.*

11

1 *Pac. Gas & Elec. Co*., 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016)).

           b. Descriptions of the facts

Under Rule 703 of the Federal Rules of Evidence, an expert is permitted to base their "opinion on facts or data in the case that the expert has been made aware of or personally observed." Thus, there is nothing that is *per se* improper in Rubin's inclusion in her report of a detailed fact section explaining the basis of her opinions. It is true that because the role of the expert is to provide "scientific, technical, or other specialized knowledge" that "will help the trier of fact [ ] understand the evidence or [ ] determine a fact in issue," Fed. R. Evid. 702, court have excluded expert testimony that is offered "solely for the purpose of constructing a factual narrative based upon record evidence." *Johns v. Bayer Corp*., No. 09CV1935 AJB DHB, 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F.Supp.2d 461, 468 (S.D.N.Y. 2005)). An objection on that basis is premature, however. The Court therefore denies Gibel's request to exclude Rubin's testimony on this basis without prejudice to Gibel objecting on this ground at trial.

           c. Rinke

Gibel asks the Court to exclude Rinke's entire report on the basis that it offers only "grade-school arithmetic," citing *inter alia*, *Waymo LLC v. Uber Techs., Inc*., No. C 17-00939 WHA, 2017 WL 5148390, at *2 (N.D. Cal. Nov. 6, 2017) (Excluding expert testimony because "[o]ther than grade-school arithmetic . . . [the expert] did not apply any coherent principle, methodology, theory, or technique." The Court declines Gibel's invitation with one exception, discussed below. In contrast to the facts of *Waymo*, Rinke's report sets forth the methodology she applied to calculate the value of Sandhu's work -- including her methodology for addressing what she found to be incomplete information in the General Ledger for the Film that was produced by Gibel. The Court therefore finds that this challenge has no merit as to Rinke's opinions related to: 1) the value of Sandhu's work on the Film regardless of whether she is a co-author; and 2) expenses for which Sandhu should be reimbursed.

On the other hand, the Court will exclude Rinke's opinions addressing the value of Sandhu's equity interest. First, Rinke has laid no factual foundation for the numbers used in her

example, which are based on the assumption that the Film will break even, giving rise to an equity interest of $263,635. *See* Rinke Decl. at 8 & Ex. 3. Even if the example were offered to the jury with the caveat that it is only a "sample calculation," it would be more prejudicial than probative under Rule 403 of the Federal Rules of Evidence. Finally, the opinion that Sandhu would be entitled 50% of the profits if she were a co-author will not be helpful to the jury as this basic concept can be easily understood by a jury without expert testimony and in any event, is not the subject of Rinke's expertise.[3]

### C.  Sandhu's *Daubert* Motion

#### 1.  Background

Gibel retained filmmaker Vivian Kleiman as an expert to provide rebuttal opinion testimony in response to Rubin's opinions on the question of joint authorship of the Film. Dowd Decl., Ex. B (Kleiman Rebuttal Expert Report) at 2. According to Kleiman, she has been an independent documentary filmmaker for over 35 years and has served as a director, producer or executive producer on a "large number of films" in that time. *Id.* This includes a 1992 film by documentary filmmaker Marlon Riggs entitled *Color Adjustment*. *Id.* She also has many years of experience teaching and mentoring young documentary filmmakers. *Id.* Kleiman states that the opinions in her report are based not only on her "observations and knowledge of custom and practice in the independent documentary film industry, but also on [her] own personal experience working on . . . *Color Adjustment*." *Id.* at 5. In one section of the report, Kleiman provides a lengthy narrative account describing her experience working on that documentary. *Id.* at 5-7.

In her report, Kleiman addresses opinions offered by Rubin as to custom and practice in the film industry. With respect to some opinions, Kleiman offers her own experience working on *Color Adjustment* as an example. *See, e.g. id.* at 8 (opining that filmmakers often work together without a written agreement and that even where responsibilities on a film change over time, it is understood that changes in the credits must be mutually agreed upon; and offering as an example

---

[3] Although Gibel did not challenge Rinke's opinion on this basis in his *Daubert* Motion, he declined to stipulate at oral argument that a finding of joint authorship would entitle Sandhu to 50% of any profits that might be earned on the Film. The Court need not resolve that question here.

13

Kleiman's experience working on *Color Adjustment*, where she asked for a producer credit based on her increased responsibilities); 10 (opining that the use of "we" on grant applications does not mean there is an understanding as to co-authorship of the film and offering as an example her work on *Color Adjustment*, where she referred to herself and Riggs as "the filmmakers" and used "we"). Many other opinions in her report do not reference Kleiman's work on *Color Adjustment* and appear to be based on Kleiman's experience generally in the field of independent documentary filmmaking or other specific experience. *See, e.g., id*. at 8 (opining that it is a common practice in the documentary film industry that people work without pay and there are many reasons for this); 9-10 (challenging Rubin's opinion that filmmakers are careful when they certify eligibility on ITVS applications and opining based on her own experience with such applications that filmmakers barely complete the applications by the deadline and that "by the time that document is signed, scanned and sent to ITVS, the filmmakers are bleary-eyed with exhaustion and not paying attention to what they are signing."); 10 (disagreeing with Rubin's opinion that having autonomy over what one says at a "pitch" presentation to potential funders implies control over the film).

In her report, Kleiman does not rely on evidence reflecting the facts of this case. *Id*. at 14. The only documents in the case she reviewed were Gibel's complaint, Sandhu's answer and counterclaims, and Rubin's report and she states that she did not rely on the facts set forth in those documents. *Id.* Even Kleiman's opinions with respect to what Sandhu contributed with respect to the appeal of the Film are not based on having actually viewed any footage from the film. *See id.* at 13 (stating that Kleiman had not seen the Film with the exception of a "very short work sample, several years ago" that she saw at a film event). Similarly, at her deposition Kleiman testified that she did not review any facts in this case in connection with her report. *See* Dowd Decl., Ex. C (Kleiman Dep.) at 14.

In Sandhu's *Daubert* Motion, she argues that Kleinman's report should be excluded in its entirety because she has admitted that she will not be able to help the trier of fact to understand the evidence or to determine a fact in issue having not reviewed them herself. As a result, Sandhu contends, Kleiman's opinions will not be helpful to the jury. Sandhu also contends Kleiman's

14

1  report should be excluded because she has not pointed to any particular methodology in support of
2  her opinions.

### 2. Discussion

The Ninth Circuit has explained that "not every expert need express, nor even hold, an opinion with regard to the issues involved in a trial . . . . Rather, the key concern is whether expert testimony will assist the trier of fact in drawing its own conclusion as to a 'fact in issue.'" *United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir. 1993). To the extent that Sandhu's expert has offered general opinions about custom and practice in the documentary film industry to support her conclusions about joint authorship, Gibel's expert may do the same so long as her opinions are otherwise admissible. In other words, Rule 702 does not require that Gibel's expert review the facts of the case or address how her general opinions about custom and practice applied to the facts of this case.

On the other hand, Kleiman will not be permitted to offer opinions about the audience appeal of the Film, including whether Sandhu's contributions to the Film should be credited for the audience appeal of the Film. Kleinman admits that she has not seen the Film or reviewed any evidence reflecting its content or style. Thus, her opinion that the appeal of the film comes from the subject of the film rather than any contributions of Sandhu has no factual basis. *See* Dowd Decl., Ex. B (Kleiman Report) at 13 ("all the filmmaker needs to do really, is point the camera at her in [sic] focus."). Nor has Kleiman offered any principles or methodology to support her opinion. Therefore, these opinions do not satisfy the requirements of Rule 702.

The Court defers ruling on Sandhu's remaining challenges to Kleiman's opinions until trial.

## V. CONCLUSION

For the reasons stated above, the Court rules as follows: 1) Gibel's Summary Judgment Motion is DENIED; 2) Gibel's *Daubert* Motion is GRANTED in part and DENIED in part; and 3) Sandhu's *Daubert* Motion is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated: September 28, 2020

JOSEPH C. SPERO
Chief Magistrate Judge