James M. Dowd (SBN 259578)
James.Dowd@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Tel: (213) 443-5300 / Fax: (213) 443-5400

Louis W. Tompros (*pro hac vice*)
Louis.Tompros@wilmerhale.com
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000 / Fax: (617) 526-5000

*Attorneys for Defendant ARJOT SANDHU*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| FOCAL POINT FILMS, LLC, a California limited liability company, | Case No.  3:19-cv-02898-JCS |
| Plaintiff/Counter-Defendant, | |
| vs. | **DEFENDANT/COUNTER-PLAINTIFF ARJOT SANDHU'S TRIAL BRIEF** |
| ARJOT SANDHU, an individual, | |
| Defendant/Counter-Plaintiff. | Trial Date: February 1, 2022<br>Time: 8:30 a.m.<br>Judge: Hon. Joseph C. Spero |
| ARJOT SANDHU, an individual, | |
| Defendant/Counter-Plaintiff, | |
| vs. | |
| FOCAL POINT FILMS, LLC, a California limited liability company, | |
| Plaintiff/Counter-Defendant, | |
| and BRYAN GIBEL, an individual, | |
| Counter-Defendant. | |

1

## TABLE OF CONTENTS

2

Page(s)

3    I.    FACTUAL BACKGROUND......................................................................................2

4    II.   PLAINTIFF CANNOT PROVE THAT FOCAL POINT IS THE SOLE AUTHOR
          OF THE FILM..................................................................................................10

5    III.  SANDHU WILL PREVAIL ON HER COUNTERCLAIM FOR JOINT

6          AUTHORSHIP.................................................................................................11

7          A.    Joint Control ......................................................................................12

           B.    Objective Manifestations Of A Shared Intent To Be Co-Authors ..........18

8          C.    Audience Appeal .................................................................................22

9    IV.   SANDHU WILL PREVAIL ON HER COUNTERCLAIM FOR UNJUST

10         ENRICHMENT..................................................................................................26

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the Court's Pretrial Order (ECF No. 103), Defendant Arjot ("Arie") Sandhu submits this brief regarding the controlling issues of law relevant to the upcoming trial in this matter. Plaintiff's claim for sole authorship of the feature-length documentary film *Sign My Name to Freedom* will fail as a matter of law because that film is unfinished, and for that reason it is premature to address copyright ownership for the feature-length film. Conversely, Sandhu will prevail on her counterclaim for joint authorship under the Copyright Act of the written narratives, footage, work samples, grant applications, pitch decks, marketing materials, transcripts, and audio recordings for *Sign My Name to Freedom* (the "Film") jointly created by Sandhu and Bryan Gibel after she joined the project. Sandhu will also prevail on her counterclaim for unjust enrichment on the basis that Gibel and Focal Point Films ("Focal Point") have retained the benefits of approximately eighteen months' worth of her work on the film without compensation.

## I.   Factual Background

*Sign My Name to Freedom* is a documentary film in production about the lost music and legacy of Betty Reid Soskin, a now-100-year-old National Park Ranger. Dkt. 20, Amended Answer at 17, 21. Gibel and Sandhu both met Soskin at separate times in 2016, about a year before meeting each other. Gibel, who first met Soskin in early 2016, had been working on what he originally contemplated to be a short Internet film about Reid's Records, a record store started by Soskin's husband, Mel Reid, in 1945 in South Berkeley, and then run by one of Soskin's children. *See* Ex. 7. The central character in this contemplated short was D'iara (formerly David) Reid, who introduced Gibel to Soskin so that Soskin could be interviewed as a supporting character. *See* Ex. 4 [Soskin Tr.] at 34:18-35:6; Ex. 37 [Reid Tr.] at 34:4-35:7. By May 2016, Gibel began contemplating a longer documentary about Reid's Records, Soskin's life, and the life of her late husband and her children. *See* Ex. 7; Ex. 37 [Reid Tr.] at 36:23-37:8 . By the time Sandhu and Gibel met, Gibel had yet to decide what story to tell or hit upon any compelling or unifying themes for that story. Ex. 37 [Reid Tr.] at 62:20-63:6.

1    While Gibel's work was casting about for direction, in July 2016, Sandhu met Soskin
2    during a photoshoot at Soskin's workplace, the Rosie the Riveter National Park.  Sandhu was
3    immediately drawn to Soskin's story and soon conceived of her own documentary film about
4    Soskin.  *See, e.g.*, Ex. 8.  On July 28, 2016, Sandhu conducted a filmed interview with Soskin
5    where Soskin discussed multiple topics such as her work as a Park Ranger at the Rosie the Riveter
6    National Historical Park and her autobiographical story.



*See* Ex. 38 (Screenshot from ASANDHU_000024817 at Interview-Ranger Soskin(byAK).mp4 at
0:39).

In March 2017, Sandhu attended a "meetup" for documentary filmmakers.  After this
meetup, Gibel approached her to discuss their respective interests and plans for documentary films.
And after this meeting, Gibel and Sandhu began corresponding about their work.  Gibel and
Sandhu began collaborating on what would become an exciting new direction for the Film—a
verité musical documentary about Soskin and the African American experience featuring a
rescoring of her original work and performances by a youth orchestra and the Oakland Symphony.
Sandhu recognized that integrating these performances into the Film, as well as interviews with

3

the performing artists, would make Soskin's musical history from nearly a half-century ago come alive for a contemporary audience.

What Gibel could not achieve alone, he and Sandhu achieved together.  Over the next year and a half plus, Sandhu and Gibel collaborated on virtually every aspect of the Film's development, production, and editing.  They worked on a shared Google Drive where they kept film footage, grant applications, promotional materials, interview summaries, draft emails, and other documents.  They jointly communicated with musical collaborators, editors, camera people, advisors, funders, distributors, and potential executive producers—holding themselves out as joint filmmakers.  They each had access to a hard drive with their complete set of all raw footage, and took turns editing footage and work samples.

Although they enlisted the help of others, Sandhu and Gibel assumed central supervisory roles as the project developed.  It was their Film.  Over the course of their work together, Gibel and Sandhu conceived and created a Film very different from either of the separate works Gibel and Sandhu originally contemplated individually.  And during their collaboration on the Film, unlike all others working on the project who were paid as work-for-hire personnel, only Gibel and Sandhu received no pay for their efforts – with each instead earning "sweat equity" in the Film itself.

Contemporaneous grant applications illustrate the marked shift in storyline, vision, and direction that occurred once Sandhu and Gibel began their collaboration.  For example, in a November 2016 grant application Gibel submitted to California Humanities (before he met Sandhu), Gibel described his film concept as chronicling "Betty's history of civil rights activism and tell[ing] the story of Reid's Records, which she and her husband started in 1945."  Ex. 9 at FPF-0027575.  Gibel described a film concept centered on the history of Soskin's family, Mel Reid, and the founding of Reid's Records:

> To open, we'll introduce Betty in the present-day, with intimate verité footage that shows her as a beloved park ranger.  We then go all the way back to Betty's early life in New Orleans and Oakland, the great migration during WWII and her and

DEFENDANT/COUNTER-PLAINTIFF ARJOT SANDHU'S TRIAL BRIEF
3:19-cv-02898-JCS

Mel's experiences with segregation, ending with decision to start Reid's Records and it's [sic] early triumph. The second act delves into Betty and Mel's move to an all-white suburb and their impact on American music, ending with their divorce and the tragic story of the end of Mel's life. In the final act, we learn that Betty eventually gave up her music to take over the record store and spearhead a movement for affordable housing, which led to decades of work as a public servant starting in her mid-70's. Now she must confront her own mortality as her son Bob struggles to follow in her footsteps as a singer/songwriter and her other son David fights to keep Reid's Records in business.

*Id*. at FPF-0027576-577. This same document confirmed that Gibel's Reid's Records film concept had raised no competitive grant funding to date and contemplated the completion of principal photography by May 2017. *Id*. at FPF-0027581, FPF-0027584.

Gibel remained fixated on his Reid's Records concept well into 2017. Ex. 37 [Reid Tr.] at 57:15-58:7; 59:7-61:3; 61:9-15 (D'iara Reid testified that as of March 2017, the Reids family and their story with respect to Reid's Records remained a central plot theme of the Film's concept and elements such as a youth performance, a full concert, a symphony orchestra, the music by contemporary artists, or Marcus Shelby were not present or discussed). In March 2017, the month Gibel met Sandhu, Gibel wrote to a third party, Milton Hopkins, to arrange an interview for that project:

Part of the film is about Betty's deceased husband Mel Reid, a legendary athlete, record store owner and gospel music promoter from Berkeley. Mel and Edwin knew each other well for many years, and Mel was Edwin's manager for their first tour overseas to Europe. If possible, I'd very much like to arrange to shoot an interview with Edwin about gospel music in the Bay Area back in the 60s, Mel Reid and their experiences touring in Europe after 'Oh Happy Day' became a worldwide hit.

Ex. 10. Gibel attached a two-page description of his vision to this email, which remained centered on the story of Reid's Records:

When Betty first met her husband Mel Reid in the 1930s, the East Bay's black population was a small fraction of what it is today. Mel was a star negro-league athlete from a family that came to California before the civil war. During WWII, the couple watched as 100,000 southern workers arrived in Richmond to work in the Kaiser Shipyards. After coming up against Jim Crow unions during the home

5

front, Betty and Mel decided never to work for white people again and started Reid's Records in 1945 in South Berkeley.

Ex. 11.  Notably, potential funding sources consistently rejected Gibel's Reid's Records concept as not worthy of investment, and Gibel never secured any competitive funding for this concept from any independent source.[1]

Moreover, in early 2017, around the time Sandhu joined the project, Gibel's project suffered from a clear lack of direction (as he himself conceded in a contemporaneous email).  In April 2017, Catherine Butler, who was then working under Gibel (under a signed agreement giving her no control interest), provided feedback highlighting the unsettled direction of the work: "While you're still working out the story arc, my suggestion is to simplify the work sample. . . . Still too focus[ed] on family pictures - not strong enough on the story line - is it a memoir?  Is it Betty's story?  Is it about the music career Betty didn't pursue (I don't think so) - and most importantly is it about Betty's music in response to the times she felt trapped by?  I think so."  Ex. 12 at FPF-0006285-286.

In June 2017, Catherine Butler and another woman working for Gibel on the Reid's Records concept, Claire Weissbluth, quit the project.  Butler's departure email highlighted Gibel's lack of direction: "As I wrote to Bryan, I can appreciate that it's truly a labor of love for him, and that it's important he continue to follow an organic process that feels right, which often takes a while.  It's been well over a year since Bryan, Claire and I started this journey together, and it's my sense [] that the film will continue to unfold in it[s] own time as Bryan finds the best storytelling structure through his ongoing filming with you."  Ex. 13 at BRS-000740.  It is clear from Butler's polite remarks that Gibel had yet to find such a structure.

It was at about this time, with Butler and Weissbluth quitting Gibel's struggling Reid's Records project, that Sandhu and Gibel began their collaboration.  Sandhu brought something new,

---

[1] The only funding that Gibel received before Sandhu joined came from Soskin, routed through the Rosie the Riveter Trust.  Ex. 4 [Soskin Tr.] at 92:16-93:8.

her impact was immediate and substantial, and she was instrumental in establishing what thereafter became the direction and story of the Film.  Whereas Gibel's project had been a historical documentary about Reid's Records and the Soskin family, Sandhu reimagined the Film as a verité musical documentary telling Soskin's story *through her collaboration with multiple generations of musicians*.  And her direction and leadership were integral to this shift.  Sandhu conceived of and worked to secure partnerships with (1) a youth orchestra, conducted by Marcus Shelby, and later (2) a public concert of Soskin's original music with the Oakland Symphony.  Footage of these performances—works fixed in a tangible medium of expression—became central points in the Film and supplied key footage and direction to the project.  As Focal Point's witness, D'iara Reid, testified, none of these elements—the incorporation of multiple generations of musicians, a symphony, a public concert, among others—were part of the Film concept before Sandhu joined the project.  *See* Ex. 37 [Reid Tr.] at 61:9-15 ("Q. [T]hose elements, those were not yet part of the film concept as of March 1st, 2017, right? A. That's correct.").

During their collaboration, Sandhu worked tirelessly to reduce this new joint concept to actual footage and make the Film a success.  Neither she nor Gibel ever signed any contract with one another.  Also like Gibel, and unlike all others connected to the project, Sandhu was not paid for her work on the Film.  Rather, Sandhu proceeded with Gibel as a partner in the filmmaking process—and was held out as such by Gibel himself.

In two separate grant applications submitted to ITVS, the Corporation for Public Broadcasting's documentary film funding and distribution service, Sandhu was listed as a "Co-Applicant" and identified as the Film's "creative producer," "responsible for developing the story, look and structure of the film, working closely with the director and other crewmembers."  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_00026, ITVS_0031; *see also* Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00073, ITVS_00077; *see also* Ex. 19 at FPF-0013085 (March 2018 email from Gibel to Tina Antolini of Popup Magazine writing "I'd love to schedule a phone call to discuss with you and my colleague Arie Sandhu, who is a creative producer on *Sign My Name*

*to Freedom*").   Notably, by identifying Sandhu as "co-applicant," Gibel confirmed that Sandhu "own[ed] copyright of the production."  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_000040; Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00085.   These joint applications requested between $290,957 to $336,957 in grant funding for the Film, and Gibel certified to ITVS that he had read and agreed to the terms of the application and reviewed the "entire application (all fields) for accuracy and completeness before submitting."  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_000036, ITVS_000041; Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00081, ITVS_00086.   In fact, Gibel made this certification identifying Sandhu as a copyright holder *twice*—once in the original ITVS first round application, and again in the "Round 2" submission. *See id.*

Gibel also repeatedly acknowledged Sandhu as his "filmmaking partner."  Ex. 14 (Gibel: "Would you be interested in getting together toward the end of this month to chat more about the idea and to meet my girlfriend and filmmaking partner, AK Sandhu?"); Ex. 21 (Gibel: "I'm writing because my partner AK Sandhu and I are making a feature documentary film about a woman named Betty Reid Soskin, who is a popular public figure as the oldest Park Ranger in the country at the Rosie the Riveter Park in Richmond.").   And Sandhu corresponded with third parties involved in the Film on behalf of the partnership.  *See, e.g.*, Ex. 22 at ASANDHU_000011066 (February 11, 2018 email from Sandhu to Bob Reid, copying Soskin and Gibel, signed "Arie & Bryan"); Ex. 23 (May 8, 2018 email from Sandhu to Paul Reid noting "This is Arie and Bryan— the filmmakers working on Betty Reid Soskin's documentary film," asking if it would be possible to interview him for the Film, and signing the email "Arie and Bryan"); Ex. 3 [Gibel Tr.] at 261:25-262:3 ("Q. And Ms. Sandhu signs this email 'Arie and Bryan,' correct?  A. She does as she signed many emails, yes, sir.").

Sandhu drafted descriptions of the Film, composed and shot footage, created and edited Film work samples, created the Film's website, drafted and submitted grant applications, independently pitched the Film to potential funders/investors, and set Film budgets.  Sandhu

worked collaboratively with Gibel on the creative planning for the Film, was integral to the editing process, and participated in translating the idea into a fixed, tangible medium of expression.  In fact, Sandhu and Gibel confirmed that the Film was their joint work at the May 2018 DocLands film festival—taking the stage together in front of a floor-to-ceiling slide proclaiming "Sign My Name To Freedom" as a feature documentary film "By: Bryan Gibel & A.K. Sandhu":



*See* Ex. 34 (screenshot of Media Ex. 2, FPF-0030856.mp4 at 5:57).  D'iara Reid testified that had she been in the audience for Sandhu and Gibel's presentation, she would have concluded the Film was their joint project.  Ex. 37 [Reid Tr.] at 127:10-16.

Sandhu's and Gibel's respective contributions were each substantial and cannot be disentangled.  Sandhu was intimately involved in conceiving of partnerships with the Marcus Shelby Youth Orchestra and the Oakland Symphony, centerpieces of the Film.  She provided direction for the Film (including for the performances of both contemporary orchestras), conducted

9

interviews with film subjects (including with contemporary performers), shot footage, and made decisions on staffing, camera placement, lighting, camera angles, and other creative production elements. She and Gibel together created work samples for the Film fixing their joint concept in a tangible medium; including the work sample they displayed to the audience at DocLands and the work sample submitted via Sandhu's account for ITVS.

Unfortunately, despite Sandhu's indelible contributions, as time progressed Gibel became increasingly insecure about his own role, apparently fearing that he was being overshadowed by a dynamic woman of color. These insecurities led Gibel to cease publicly acknowledging Sandhu as his "filmmaking partner," then to attempt unceremoniously to cut Sandhu out of meetings with Film subjects and potential financers, then to secretly change the passwords required to access Film resources (thereby denying Sandhu access to their joint work).

As a final step, after receiving the benefits of Sandhu's labor and contributions, Gibel used his Focal Point LLC entity to sue Sandhu in early 2019 seeking to deny her rights as a co-author. He then prematurely filed (and later withdrew) a motion for default judgment in an attempt to deprive Sandhu of her rights before she could obtain counsel to respond (Dkt. 10, Dkt. 11.) Upon securing *pro bono* counsel, Sandhu counterclaimed against Gibel and Focal Point for declaratory judgment of joint authorship and other claims, including (as relevant here) unjust enrichment. Sandhu based her unjust enrichment claim on having performed "services as an author, producer, cinematographer, director, editor, photographer, or promoter of the Film" without "compensation for her" work. *See* Amended Answer (Dkt. 20) at Counterclaim ¶ 62. And she specifically prayed for relief in the form of money "damages, including but not limited to compensatory and punitive damages, together with pre-judgment and post-judgment interest, in an amount to be determined at trial." *Id.* at Prayer for Relief ¶ 3.

## II.   Plaintiff Cannot Prove That Focal Point Is The Sole Author Of The Film

Plaintiff's Complaint alleged that Focal Point is the sole author of the feature-length documentary film *Sign My Name To Freedom*. Dkt. 1, Complaint at ¶ 42. This allegation rests on

10

an *a priori* assumption that the feature-length documentary itself has been fixed in a tangible medium of expression. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989) ("copyright protection subsists from the moment the work is 'fixed in any tangible medium of expression.'" (quoting 17 U.S.C. § 102(a)). Here, however Plaintiff has expressly disavowed that the feature-length documentary has been fixed in any tangible medium of expression. Ex. 3 [Gibel Tr.] at 23:25-24:8, 24:21-23 ("A. *Sign My Name to Freedom* is not a completed film. It's a work in progress. … Q. Is *Sign My Name to Freedom* fixed in a tangible form? A. No."). Because the feature-length documentary has not been fixed in a tangible medium of expression, Plaintiff has pled no viable claim.

## III.    Sandhu Will Prevail On Her Counterclaim For Joint Authorship

Sandhu will prevail on her counterclaim for joint authorship as to all of the written narratives, footage, work samples, grant applications, pitch decks, marketing materials, transcripts, and audio recordings for the Film that she and Gibel jointly created because she satisfies all three factors set forth by the Ninth Circuit.

Joint authorship is determined based on: (1) whether each of the parties exercised control over the work; (2) whether each of the parties' actions showed they shared the intent to be co-authors; and (3) whether the audience-appeal of the work depends on the contribution of each party so that the share of each party's contribution to the work's success cannot be appraised. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1233-36 (9th Cir. 2000). "In making a substantial and valuable contribution to a work, each author's contribution to the joint work need not be equal." Model Civ. Jury Instr. 9th Cir. 17.9 (2021); *Brownstein v. Lindsay*, 742 F.3d 55, 65 (3d Cir. 2014) ("[C]oauthor's contribution need not be equal for them to have an equal stake in the work as a whole."). The evidence at trial, including the expected testimony of Sandhu's expert Professor Sarah Rubin,[2] will prove all three factors of joint authorship.

---

[2] Notably, Focal Point neither served an expert report in support its claim of sole authorship nor deposed Professor Rubin.

A.    *Joint Control*

The evidence will show that Sandhu and Gibel were partners who jointly controlled the Film in multiple ways.

First, Sandhu exercised control over the written narratives, footage, work samples, grant applications, pitch decks, marketing materials, transcripts, and audio recordings that currently exists for the Film by developing the story and shaping the narrative and artistic vision of the Film. Contrasting two California Humanities grant applications—one from 2016 before Sandhu and Gibel began their collaboration, and one from 2017 after their collaboration began—shows Sandhu's control over the Film as it was in progress.   In the 2016 California Humanities application, which Gibel submitted independently, Gibel said his concept "chronicles Betty's history of civil rights activism and tells the story of Reid's Records, which she and her husband started in 1945." Ex. 9 at FPF-0027575.  His proposed first act would "introduce Betty," including her "early life in New Orleans and Oakland, the great migration during WWII and her and Mel's experiences with segregation, ending with decision to start Reid's Records and it's early triumph." *Id.* at FPF-0027576.  His proposed second act would "delve[] into Betty and Mel's move to an all-white suburb."  *Id.* at FPF-0027576-77.  And his final act would focus on Soskin's "mortality as her son Bob struggles to follow in her footsteps as a singer/songwriter and her other son David fights to keep Reid's Records in business."  *Id.* at FPF-0027577.

The solo concept Gibel described in 2016 was very different from the joint concept Sandhu and Gibel developed together for the 2017 application.  For example, the 2017 application describes a dynamic documentary with contemporary musical collaborations in which "Betty teams up with composer Marcus Shelby and an orchestra of young musicians to perform new arrangements of her songs, sparking an autobiographical journey through the black experience by three generations of California musicians." Ex. 15 at FPF-0027898.  It explains that the "present day story arc that begins with Betty meeting Marcus and his musicians," followed by a "dive into Betty and her family's personal history using the autobiographical nature of Betty's songs as a

natural bridge into the past," and ending with Soskin and Shelby "performing their music live to the public." *Id*. at FPF-0027900. Ex. 37 [Reid Tr.] at 86:11-87:7 (D'iara Reid testifying that none of these elements, such as a youth performance, a full concert, a symphony orchestra, the music by contemporary artists, or Marcus Shelby was present in Gibel's 2016 application).

The California Humanities reviewers took note of the stark contrast between the two applications. The reviewer of the 2016 application noted that the project "feels like mostly an historical film whose subject just happens to still be alive" and that "Soskin deserves a strong documentary treatment of her life and I hope the filmmaker finds a way to do it justice." Ex. 16 at Cal_Hum000175. Notably, Gibel testified that this lackluster film concept California Humanities rejected as failing to do Soskin "justice" was, nevertheless, his "clear vision" of the film that he had wanted to produce at that time. Ex. 3 [Gibel Tr.] at 74:6-9 ("I had a clear vision as articulated in the grant applications that Ms. Butler and myself and Claire Weissbluth had put together."); *see also* Ex. 37 [Reid Tr.] at 89:5-9 ("Q. Now, as of 2016, the concept Mr. Gibel had in 2016, that Cal Humanities reaction was that he had found – he had failed to find a way to do justice to Ms. Soskin's story, right? Q. It seems so.").

After Sandhu and Gibel began collaborating on their new joint Film concept, however, the California Humanities reviewer praised the Film as "[a] compelling project." Ex. 17 at Cal_Hum000132. The reviewer highlighted that "[t]he contemporary storyline really helps solidify the film, and there exists great potential in the power of the arcs from the past and the present as they intertwine," and found that the "[g]oals are clear and relevant, and potential for meaningful impact is strong." Ex. 17 at Cal_Hum000132-133. As Professor Rubin will explain, "[i]n the documentary film industry, changing the narrative structure and centerpiece of a film is something only an author of the documentary can do, not something that could come from simply a below-the-line, employee for hire. Because Sandhu and Gibel executed this work together, it is clear that they both had control over the Film." Ex 1 [Rubin Report] at 35.

13

What the California Humanities applications make obvious, the ITVS applications make explicit by stating "Arjot Sandhu is **responsible** for developing the story, look and structure of the film[.]"  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_00031 (emphasis added); Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00077.  Indeed, by naming each of Gibel and Sandhu as "co-applicants," the ITVS applications expressly confirm that each party: "a) **own[s the] copyright** of the production detailed above; [and] b) **ha[s]** artistic, budgetary, and editorial **control** of proposed Project."  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_00040 (emphasis added); Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00085.  Because the applications Gibel submitted to ITVS state in black and white that Sandhu is a joint "owner" of the Film's copyright, and had joint "control" over the project, it is hard to conceive of a more explicit manifestation of control—and intent to be joint authors—short of a signed agreement between Sandhu and Gibel themselves.

Sandhu also exercised control through her management of the Film's finances and budget. Sandhu created and managed the deferred work tab of the general ledger document, which tracked most of the shoots, edits, and major meetings for the Film as well as hours worked, and money owed.  And everyone who did get paid for work on the film was paid from grant money that Sandhu was instrumental in securing.  Gibel admitted Sandhu's control by testifying that he did not add to the deferred work tab because he "was busy doing other stuff."  Ex. 3 [Gibel Tr.] at 332:8-20. Gibel also admitted that "Sandhu was oftentimes maybe taking a lead on drafting up the budgets." *Id*. at 307:23-25.  Gibel also named Sandhu as "co-director" of the Film in the budget he emailed to ITVS, a fact he tries to explain away by contending she somehow "snuck" that credit into his email.  The excuses Gibel offers today, however, directly contradict his written certification to ITVS that he had reviewed the "entire application (all fields) for accuracy and completeness" before submitting it.  And as Professor Rubin will testify, Gibel's excuses (if accepted) only further demonstrate Sandhu's control over the film's finances and Gibel and Sandhu's filmmaking partnership.  Ex. 1 [Rubin Report] at 36 ("If in fact there were such an oversight on Mr. Gibel's part, it only proves the point that they trusted one another completely, as filmmaking collaborators,

14

1   partners, and co-authors, and that Ms. Sandhu retained control over this budget."). Indeed, the

2   very idea that Sandhu could "sneak" something into a document as important as an application for

3   $336,957 in grant funding is inconsistent with Gibel's claim that he alone exercised control.

4       Sandhu further exercised control because she directed the position and arrangements for

5   numerous scenes for the Film, without consultation with or approval by Gibel. For example,

6   Sandhu directed interviews for the Film. Ex. 3 [Gibel Tr.] at 240:10-13 ("Well, yeah, in this case

7   she took the lead on asking questions for this interview."). Sandhu arranged interview subjects

8   from the San Francisco Community Music Center, including establishing appropriate camera and

9   audio settings and providing context to the interview subjects about what to expect while filming.

10  Media Ex. 4 (MVI_4146) at 00:19-00:47 (Sandhu directing student orchestra member); Media Ex.

11  5 (AKS_3735) at 04:28-04:48 (Sandhu sets the stage for the conversation with the children that

12  were to perform Soskin's songs). During these interviews, Sandhu can be seen actively overruling

13  Gibel on directorial issues, including correcting the camera that Gibel was operating. Media Ex.

14  4 (MVI_4146) at 00:48-00:57 (Sandhu: "I think Bryan just moved the camera, do you need to

15  refocus." Gibel: "No, it's good." Sandhu: "Move the camera, Bryan." Gibel: "Okay, it's in

16  focus now, it's refocused. Thank you."). Sandhu also worked in concert with Gibel to establish

17  optimal equipment for audio capture. *See id*. at 01:51-04:02, 07:11-07:55. Not only were these

18  decisions critical to the specific activity recorded in the scenes, but the creative decisions gave

19  effect to the ideas conveyed in the Film. And these examples typify Sandhu's working relationship

20  with Gibel. In these ways, Sandhu "arranged the composition for each shot" and "directed [Gibel]

21  to make changes to the camera angles"—exercising the same level of control that the Ninth Circuit

22  has held entitle a party to co-authorship (and the full copyrights that status entails). *Brod v. Gen.*

23  *Pub. Grp., Inc*., 32 F. App'x 231, 235 (9th Cir. 2002) (nonprecedential).

24      Sandhu also directed. She coordinated with the Youth Orchestra director, Sylvia Sherman,

25  to select the appropriate attire for the performers that would present best on film. *See, e.g*., Ex. 24

26  (email from Sandhu to Sherman regarding appropriate concert attire for performers). She

27

28

15

independently positioned the cameras to capture her vision of live performance footage for the Film.  Media Ex. 6 (P1040765) at 00:00-01:05 (showing Sandhu adjusting cameras at finale of Community Music Center performance, without the input from Gibel); Ex. 3 [Gibel Tr.] at 254:7-259:25.  She directed the Film's central characters, including Soskin and Marcus Shelby, selecting where each stood on stage with the performers for candid footage.  *See* Media Ex. 7 (ASANDHU_000024186) at 20:02-20:33.  In these ways, and numerous others, Sandhu was "putting the persons in position, and arranging the place where the people are to be" as one would expect of a co-author that superintends the work.  *See, e.g.*, *Aalmuhammed*, 202 F.3d at 1235 (quotation and citation omitted); *see also Brown v. Beatty*, No. CV 16-7666 PA (GJSX), 2017 WL 6940518, at *3 (C.D. Cal. Nov. 9, 2017).

Even Soskin, who is personally close to Gibel, admitted that Sandhu was in control.  Soskin recognized that Sandhu was the driving force behind progress on the Film, stating that "[o]nce Arie became a part of [the Film], she was always seeming to be bending the work" to her own creative vision.  Ex. 4 [Soskin Tr.] at 116:7-12.  Soskin similarly testified that "it was obvious that [Sandhu] was shaping the film."  *Id*. at 116:16; *see also id*. at 121:23-122:1 (testifying "Arie had found a way to produce her film" and "would over time take over the production.").  In an unscripted moment between shooting scenes, Soskin even told members of the Film crew and Gibel himself that "[i]f Ar[ie] says stop, there we stop."  Media Ex. 3 (AKS_1406) at 00:54-01:12; *see* Ex. 3 [Gibel Tr.] at 237:6-238:16.

Focal Point's main argument for this factor appears to be that Gibel initiated contact with Soskin, and that Focal Point is a party to Soskin's personal appearance and other releases for the Film.  But these indicators are equally consistent with joint authorship, are far from the only factors, and are certainly not dispositive in a case like this with clear evidence Sandhu exercised a similar level of control.  *See Brown*, 2017 WL 6940518, at *4 (denying motion for summary judgment where both parties "assert that they controlled the production down to the level of, among other things, overseeing and conducting interviews, supervising the crew, and directing shoots").

As Professor Rubin explains, it is quite common for joint authors of a documentary film with a minimal operating budget to divide tasks between them for efficiency reasons—as appears to be the case with Sandhu and Gibel.  Thus, it was natural for Sandhu to take the lead promoting the film, networking, generating critical acclaim, managing the budget, and taking on other business-oriented roles that play to her strengths.  It was similarly natural for Gibel, due to his friendship with Soskin's daughter D'iara Reid, to take the lead in securing her appearance releases.  As Professor Rubin explains, however, such efficient division of labor is consistent with *joint* control over the film—not that either one alone had sole control.  *See* Ex. 1 [Rubin Report] at 17.

Further, even if Focal Point were to succeed in convincing a fact finder that that it controlled Soskin's appearance releases, that does not diminish the control Sandhu also exercised as Gibel twice acknowledged in writing to ITVS.  "Different people do creative work together in different ways, and even among the same people working together the relationship may change over time as the work proceeds.'" *Aurora World, Inc. v. Ty Inc*., No. CV 09-08463 MMM (EX), 2011 WL 13176413, at *10 (C.D. Cal. Mar. 14, 2011) (quoting *Aalmuhammed*, 202 F.3d at 1235).

Lastly, Sandhu asserted control as one of the film project's "master minds."  *See Aalmuhammed*, 202 F.3d at 1234.  It is well established that a work may have more than one master mind, as long as each makes an independently copyrightable contribution.  *See Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990).  As further discussed below (*infra* Section III(C)), Sandhu's contributions as a "master mind" changed the plotline of the Film and resulted in successful grant applications and a level of community engagement that Gibel was simply unable to achieve on his own.  The fact that Gibel has contributed copyrightable material to a joint project does not mean that he is a *sole* author of the written narratives, footage, work samples, grant applications, pitch decks, marketing materials, transcripts, and audio recordings.  *See* Model Civ. Jury Instr. 9th Cir. 17.9 cmt. (2021).

B.      ***Objective Manifestations Of A Shared Intent To Be Co-Authors***

Gibel and Sandhu never had a written contract with one another delineating their respective roles on the Film, but each made repeated objective manifestations of a shared intent to be coauthors.  *Aalmuhammed*, 202 F.3d at 1235 ("The best objective manifestation of a shared intent, of course, is a contract saying that the parties intend to be or not to be co-authors.  In the absence of a contract, the inquiry must of necessity focus on the facts.").

One clear manifestation came at the 2018 DocLands Film Festival in San Rafael, California.



*See* Ex. 35 (screenshot of Media Ex. 2, FPF-0030856.mp4 at 2:10).  Short of a signed contract, it is (again) hard to conceive of an objective manifestation of shared intent to be co-authors that could be more clear and unequivocal than standing before an audience of one's peers, potential funders, and distributors in the documentary film community and proclaiming publicly that "*Sign My Name To Freedom*" is "A FEATURE DOCUMENTARY FILM CURRENTLY IN PRODUCTION BY: Bryan Gibel & A.K. Sandhu."  *See* Media Ex. 1 and Media Ex. 2; *see also* Ex. 3

18

[Gibel Tr.] at 225:19-226:25 (confirming "there were between 500 and a thousand people present at the DocPitch presentation for *Sign My Name to Freedom*" and that funders and other filmmakers were present.).

The Film was introduced as "their project." Ex. 3 [Gibel Tr.] at 231:15-19 ("Q. The person introducing you introduced you and Ms. Sandhu as 'Bryan Gibel and A.K. Sandhu with their project Sign My Name to Freedom,' correct?  A. It is a project we were both working on, absolutely.").  Sandhu and Gibel shared the stage.  They took turns presenting the Film and answering audience questions.  As Gibel testified, there was simply no hierarchy between he and Sandhu during the presentation.  Ex. 3 [Gibel Tr.] at 234:5-10 ("Q. Did you present any hierarchy in the answering of those questions?  A. I mean, it wasn't even on my radar.  We were trying to pitch the film effectively.  Presenting a hierarchy, like, how does that effectively pitch a film?").  By taking the stage together, in front of massive slide stating that the Film was "by" each of them, Gibel and Sandhu manifested a belief that they were co-authors.  *See* Ex. 29 (DocLands Instagram account containing an image of Gibel and Sandhu on stage and reciting "Next up is 'Sign My Name to Freedom' directed by Bryan Gibel and AK Sandhu"); Ex. 37 [Reid Tr.] at 127:10-16. (D'iara Reid testified that had she been in the audience for Sandhu and Gibel's presentation, she would have concluded the Film was their joint project).

Sandhu and Gibel's presentation at DocLands is far from an isolated piece of evidence.  They confirmed their intent to be co-authors when they represented they co-owned the copyright of the Film to ITVS, referred to each other as "filmmaking partners," jointly pitched and fundraised for the Film as co-creators, and corresponded with third parties interchangeably as a unit, all of which correctly led third parties to believe that they were equals.

Specifically, as noted above, Gibel and Sandhu applied as "co-applicants" to ITVS.  There is no requirement to have a co-applicant for an ITVS application.  In fact, when Gibel applied to ITVS in 2017, even though Butler was listed as an executive producer and Weissbluth was listed as a co-producer, there was no "co-applicant" listed on the application.  Ex. 20 [2017 Round 1

19

ITVS Application] at ITVS_00023.  That is because the ITVS application clearly states "[e]ach [applicant] must play a primary role on the proposed project and meet our eligibility requirements" (and neither Butler nor Weissbluth met ITVS's criteria).  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_00024; Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00071; Ex. 20 [2017 Round 1 ITVS Application] at ITVS_00001.  And ITVS's eligibility requirements, which are included in the body of the application, recite:  "[a]pplicant(s) are individuals . . . who a) *own [the] copyright* of the production detailed above; b) *have* artistic, budgetary, and editorial *control* of proposed Project" and "*hold* 100% of the US *broadcast rights* to the project and will be willing to license them to ITVS in exchange for production and funding."  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_00040 (emphasis added); Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00085.  By certifying and submitting the ITVS application, Gibel agreed in writing that all three facts were true of Sandhu.  And ITVS Applicants are required to read and agree to all terms and review the entire application before submission.  The description of Sandhu's role on the Film in the body of the ITVS application also objectively manifests an intent to be co-authors.  Sandhu's and Gibel's roles are similarly described, with Sandhu described as "responsible for developing the story, look and structure of the film, working closely with the director and other crew members.  She also manages funding, outreach and graphic design, and serves as a co-director of photography."  Ex. 5 [2018 Round 1 ITVS Application] at ITVS_00031; Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00077.  And as noted above, the budget that Gibel emailed to ITVS credits Sandhu as "co-director."  Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00095.

Moreover, Gibel and Sandhu each operated the *Sign My Name to Freedom* email account and, separately, each sent numerous communications on behalf of the Film and signed them as from both Gibel and Sandhu.  Ex. 3 [Gibel Tr.] at 176:18-177:1 (Q. You and Ms. Sandhu created a *Sign My Name to Freedom* email address, correct?  A. She assisted me in creating a *Sign My Name to Freedom* email address . . . Q. She had access to that email account, correct?  A. I shared the password with her, sure . . . Q. Did anybody besides you and Ms. Sandhu have the password

to the *Sign My Name to Freedom* email account?  A. I don't believe so."); *id.* at 261:25-262:3 ("Q. And Ms. Sandhu signs this email 'Arie and Bryan,' correct?  A. She does as she signed many emails, yes, sir.").   For example, Ex. 21 shows that in October 2018, Gibel wrote to Omid Zoufonoun, the Youth Orchestra Principal Conductor for the Oakland Symphony, "my partner AK Sandhu and I are making a feature documentary film about a woman named Betty Reid Soskin." Gibel writes it is "*[o]ur* film", that "*we* have been filming with Betty as she collaborates with San Francisco-based composer Marcus Shelby to reinterpret her songs for the present day," "*[w]e'd* also very much like to discuss the project with you," and notes, "here's a short work sample for the film."  Ex. 21; *see also* Ex. 30 at ASANDHU-000011932 (Gibel's email to Mike Kappus (a donor to the Film) referencing "our film," noting Gibel was "inspired by your work and also by seeing how you guys operate as a couple that also runs a business together," and signing the email "Bryan and Arie.").

Sandhu and Gibel's representations led others to conclude, correctly and objectively, that they were joint authors.  The California Humanities website identifies its grant as provided to "filmmakers A.K. Sandhu and Bryan Gibel," for example, while the Berkeley Film Foundation listed both Sandhu and Gibel as winners of the 2018 Saul Zaentz Award.  Ex. 31; Ex. 32; *see also* Ex. 3 [Gibel Tr.] at 171:3-14, 173:13-16 (confirming that Berkeley Film Foundation's award for *Sign My Name to Freedom* was made jointly to Sandhu and Gibel as joint grant recipients for the Film).  Moreover, third parties routinely directed inquiries to them together and took direction from each of them.  Ex. 33 at ASANDHU_000012335 (email from the Film's music supervisor noting "if we draft one Agreement, the parties on the Agreement would be the Production Company (you and A.K.)"); Ex. 25 at ASANDHU_000011021 ("Appreciate you both taking the time to get on the phone and talk through your project with us . . . Do you guys have any written materials on your film?"); Ex. 24 (email from Sylvia Sherman of the San Francisco Community Music Center to "AK and Bryan" discussing preparations for the concert).

21

Focal Point's main argument on this factor—that Gibel **subjectively** did not intend to be a co-author with Sandhu—misapplies the objective manifestation test. *Aalmuhammed*, 202 F.3d at 1234 (explaining "[w]e say objective manifestations because, were the mutual intent to be determined by subjective intent, it could become an instrument of fraud, were one coauthor to hide from the other an intention to take sole credit for the work."). Gibel now says it was always clear "in [his] head" that he and Sandhu were not joint authors of the Film. *See* Ex. 3 [Gibel Tr.] at 217:12-14 ("it was always clear . . . and in my head, that I was the sole owner of the film through Focal Point Films."); *id*. at 218:12-13 ("The question of ownership was 100 percent clear in my head . . . "). But Gibel's **objective** statements, conduct, and other manifestations before he sued Sandhu prove otherwise.

### C.    *Audience Appeal*

This factor strongly favors Sandhu's status as co-author. Before collaborating with Sandhu, Gibel's solo documentary concept was rejected as lacking by potential independent funders. It was Sandhu's contributions that resulted in successful grant applications and a level of community engagement unseen by Gibel's prior project.

Gibel's solo project received no competitive grant funding. Prior to Sandhu's ideas, direction, shots, and editing, and their joint collaboration on the Film, Gibel's Reid's Records project had received only a nominal contribution that Soskin personally steered to Gibel. Ex. 9 at FPF-0027567, FPF-0027584.

After Sandhu and Gibel began working together, however, the Film received favorable attention from major independent documentary funding sources—including in the form of successful grant applications. Ex. 6 [2018 Round 2 ITVS Application] at ITVS_00079-ITVS_00080 (noting the $20,000 "[c]ompetitive documentary film production grant" from California Humanities, the $25,000 "competitive documentary film production grant" from Berkeley Film Foundation), and the $8,000 "[c]ompetitive grant" from Bay Area Video Coalition). The combined vision for the Film, which Sandhu jointly developed, captured the attention of grant

organizations, which only then recognized the appeal and contemporary importance of Soskin's tale of addressing personal hardship through music.

Moreover, Sandhu's perspective and experience as a woman of color positively impacted the development and reception of the Film.  Soskin's story recalls her struggles in the Civil Rights Era, and Sandhu's experiences and viewpoint (as a beneficiary of those struggles) added passion, excitement, and authenticity to the filmmaking process.  For example, Sandhu's experience as a woman of color gave her insights and connections with the subjects and characters of the Film, helped open avenues Gibel could not have as readily explored on his own (if at all), and helped build rapport and trust that allowed participants open up more fully on camera and in other settings than they likely would have in a discussion with Gibel alone.  *See* Media Ex. 5 (AKS_3735) at 05:22-05:52 (Sandhu eliciting intimate footage from an African American Youth Orchestra student:"[t]he songs she writes—they're still relevant to me."); *see also Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1146 (C.D. Cal. 2007) ("Superboy's appeal to the public was not only in reading the harrowing tales of the superhero's exploits but also in the colorful imagery Shuster provided to grip the reader's imagination.").

Indeed, Gibel and Focal Point have tacitly conceded that the audience appeal of the work turns on Sandhu's contributions.  The only argument Focal Point and its rebuttal expert, Vivian Kleiman, have made on this factor is to suggest that Soskin, ***alone***, is the audience appeal.  Kleiman even went so far as to write that "all the filmmaker needs to do really, is point the camera at her in focus."  Ex. 27 [Kleiman Report Excerpts] at ¶ 42.  But the evidence at trial will clearly disprove this hindsight position.

***First***, at her deposition, Kleiman disavowed her statement quoted above (and expressly disagreed with her previous opinion) that all that was needed was to point the camera at Soskin. *See* Ex. 36 [Kleiman Tr.] at 80:14-21 ("I actually don't agree with that statement.").  No evidence supports Kleiman's now disavowed statement.

***Second,*** a prior Executive Producer, Catherine Butler, left Gibel's solo project because it lacked direction – confirming that Soskin alone was not enough.  Ex. 12 at FPF-0006286 ("Still too focus[ed] on family pictures - not strong enough on the story line - is it a memoir?  Is it Betty's story?  Is it about the music career Betty didn't pursue (I don't think so) - and most importantly is it about Betty's music in response to the times she felt trapped by?  I think SO...").  As Professor Rubin explained in her expert report:  "Generally, Executive Producers only leave a production when they have lost faith that a film will be completed and/or generate any funding.  Ms. Butler expressed these concerns."  Ex. 1 [Rubin Report] at 41.  Notably, Ms. Kleiman did not dispute Professor Rubin on this point.

***Third***, not only did Gibel's solo concept receive ***no*** competitive grant funding, but California Humanities' evaluation confirms that Soskin—alone—was not enough to generate audience appeal.  In rejecting Gibel's 2016 grant application, California Humanities wrote that Gibel's "concept and sample . . . do not seem to make the most of [Soskin] as a character" including because his footage was not "intimate and compelling."  Ex. 16 at Cal_Hum000175.  Indeed, California Humanities specifically criticized Gibel's concept because it "relie[d] on talking heads that feel formal/distant despite the important content."  *Id*. at Cal_Hum000176.  Thus, while "important" as a subject, Soskin alone proved not enough to make a compelling documentary that anyone would fund (much less watch).  It was the storytelling approach ***Sandhu*** contributed that turned this important subject into an appealing Film.  Ex. 1 [Rubin Report] at 43.

The impact of Sandhu's contributions was confirmed by California Humanities review of the ***joint*** Film concept after she and Gibel began their collaboration.  In stark contrast to Gibel's solo effort, California Humanities praised their joint concept in 2017 as "[a] compelling project," where "[t]he contemporary storyline really helps solidify the film, and there exists great potential in the power of the arcs from the past and the present as they intertwine," and that "the concert sounds awesome."  Ex. 17; *see also* Ex. 1 [Rubin Report] at 42-43.  In other words, the very elements that Sandhu contributed are what now made the Film appealing (and worth funding).

**Fourth**, there is no dispute that Sandhu's involvement in the Film made the Film more marketable to grant organizations—and that increased funding leads to a better, more successful, product. Both parties' experts agreed that grant funding organizations care about the diversity of the filmmaking team. Ex. 1 [Rubin Report] at 44-45 ("grant institutions like ITVS ask for the ethnicity of its applicants—indeed, this element is extremely important to them—and Sandhu's ethnicity is indicated on the ITVS application Gibel and Sandhu submitted for the Film as co-applicants"); Ex. 27 [Kleiman Report Excerpts] at ¶ 43 ("Yes, funders pay attention to the entire film team, most especially when the director lacks experience . . . Unless explicitly stated that the grant is for people of color, I don't think an application would be rejected if it failed to have a person from that community involved as a producer. But it is true that the application most likely would compete with a handicap."). Indeed, Sandhu brought on to the project esteemed executive producer Julie Parker Benello, a champion for diverse females in film whose credits include the Oscar winning film, *American Factory*, and who is well known for promoting films made by women (especially women of color). *See, e.g.*, https://chickeneggpics.org/about-core-item/julie-parker-benello/ ("Julie co-founded Chicken & Egg Pictures in 2005 with a shared belief that diverse women nonfiction storytellers have the power to catalyze change at home and around the globe."). It is highly unlikely (if not clearly impossible) that Gibel alone could have brought Benello onto the project.

Thus, Focal Point's "point the camera" theory of audience appeal is facially implausible.

Because the evidence will overwhelmingly show that (1) both parties exercised control; (2) Sandhu and Gibel made objective manifestations of an intent to be co-authors; and (3) the audience appeal of the Film is due to the contributions of Sandhu and Gibel, jointly, Sandhu expects to prevail at trial on her claim that she is a joint author of the written narratives, footage, work samples, grant applications, pitch decks, marketing materials, transcripts, and audio recordings that currently exists for the Film.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.    Sandhu Will Prevail On Her Counterclaim For Unjust Enrichment**

Sandhu's claim for unjust enrichment is "based on the theory that Sandhu worked without compensation because she understood that she would, as cocreator, receive a share of the profits." Dkt. No. 54 at 18.  The evidence at trial will show that Focal Point and Gibel received the benefit of Sandhu's contributions to the Film without compensating her, to her detriment.

The elements of unjust enrichment under California law are straightforward: "[t]o allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Capital Partners, L.P. v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016); *see also In re Arizona Theranos, Inc., Litig.*, 308 F. Supp. 3d 1026, 1057 (D. Ariz. 2018) ("Under California law, 'the elements for a claim of unjust enrichment [are] receipt of a benefit and unjust retention of the benefit at the expense of another.'" (citation omitted)); *Lompa Farms, Inc. v. Anchor Warehouse Servs. LLC*, No. 5:11-CV-00062 EJD, 2012 WL 967977, at *3 (N.D. Cal. Mar. 21, 2012) (stating elements as "(1) receipt of a benefit; and (2) the unjust retention of the benefit at the expense of another.").

As described in detail in the expert report of Sara Rinke, Focal Point owes Sandhu a considerable sum for her work on the Film.  *See* Ex. 2 [Rinke Report].  Rinke used two methodologies to calculate the money owed to Sandhu.  For the first, Rinke used the general ledger for the Film—which includes some, but not all, of the work Sandhu (and others) performed on the Film and a rate for each role.  For example, the general ledger indicates that Sandhu's last day of work was October 14, 2018 even though she in fact continued working on the Film though at least December 31, 2018.  *See* Ex. 26 (Email re: Updated SMNTF Work Sample + Still Frames from the Paramount, dated December 31, 2018).  Using only the hours and below market rates included in the general ledger, Rinke calculated that Sandhu is owed at least $31,100.[3]  *See* Ex. 2 [Rinke Report] at 10.

---

[3] The $31,100 figure does not include pre- or post-judgment interest, but does deduct the nominal reimbursements Sandhu has received for her work on the Film.

The second methodology Rinke used assumed a flat-fee compensation agreement based off of the ITVS application budget Sandhu and Gibel submitted. *Id*. at 11. The ITVS budget listed Sandhu's role as Producer/Co-Director/Co-[Director of Photography]/Co-Editor," with an estimated total cost of $96,000. *Id*. Because this $96,000 fee accounted for Sandhu's involvement in the Film through its completion, Rinke prorated the $96,000 to account for the period that Sandhu was involved with the Film. *Id*. That value is $65,700.[4] *Id*.

Rinke also calculated that Sandhu is due at least an additional $2,865.02 in reimbursements for out-of-pocket expenses. *Id*. at 12. Therefore, whether or not Sandhu is determined to be a joint author of the Film she will be owed at least $33,965.02 to $68,565.02 not including pre- and post-judgment interest for her work on the Film..

In response, Focal Point has raised no affirmative defenses to Sandhu's unjust enrichment claim. *See* Dkt. 87 (Plaintiff/Counter-Defendant Focal Point Films, LLC and Counter-Defendant Bryan Gibel's Answer). Belatedly, Focal Point and Gibel now allege that the parties verbally agreed upon an hourly/daily rate and deferred compensation structure for the work Sandhu performed over approximately eighteen months. However, even this (previously undisclosed) verbal contract argument is flawed and barred by California's Statute of Frauds. Under California Civil Code § 1624(a), "[a]n agreement that by its terms is not to be performed within a year" is invalid if not memorialized in a written contract.

Because the evidence will overwhelmingly show that Focal Point and Gibel received and unjustly retained a benefit at Sandhu's expense, Sandhu expects to prevail at trial on her claim for unjust enrichment.

---

[4] The $65,700 figure does not include pre- or post-judgment interest, but does deduct the nominal reimbursements Sandhu has received for her work on the Film.

1    Dated: November 30, 2021                    Respectfully submitted,

2

3                                                By: */s/ James M. Dowd*

4                                                James M.  Dowd
                                                 WILMER CUTLER PICKERING
5                                                HALE AND DORR LLP
                                                 350 South Grand Avenue, Suite 2400
6                                                Los Angeles, CA 90071
                                                 Tel: (213) 443-5300 / Fax: (213) 443-5400
7

8                                                Louis W.  Tompros
                                                 WILMER CUTLER PICKERING
9                                                HALE AND DORR LLP
                                                 60 State Street
10                                               Boston, MA 02109
                                                 Tel: (617) 526-6000 / Fax: (617) 526-5000
11

12                                               Attorneys for Defendant/Counter-Plaintiff ARJOT
                                                 SANDHU
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                               28

28